# In the United States Court of Federal Claims

No. 17-1898T, 17-2022T, 17-2023T
(Decided: November 10, 2022)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DILLON TRUST COMPANY LLC, et al.,

        *Plaintiffs*,

v.

THE UNITED STATES,

        *Defendant.*

Keywords: federal income tax; I.R.C. § 6603 deposits; underpayment interest; interest on deposits; jurisdiction; illegal exaction

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Lawrence M. Hill,* Steptoe & Johnson LLP, Washington, DC, with whom were *Richard A. Nessler*, *Steven R. Dixon*, *Caitlin R. Tharp*, for plaintiffs.

    *Joseph A. Sergi*, Attorney of Record, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *Dara B. Oliphant*, Assistant Chief, Civil Trial Section – Central, *Margaret E. Sheer*, Trial Attorney, *Jeffrey N. Nunez*, Trial Attorney, *Ryan O. McMonagle*, Trial Attorney, *Emily K. Miller*, Trial Attorney, for defendant.

## OPINION

BRUGGINK, *Judge*.

    This is a consolidated case of actions brought by Dillon Trust Company LLC, as trustee for three Dillon family trusts ("Trust 709204," "Trust 709210," and "Trust 8545").[1] Plaintiffs seek in these actions a refund of the taxes, penalties, and interest

---

[1] Plaintiffs are three of the nine original Dillon family trusts ("Original Trusts") against which the IRS asserted transferee liabilities under I.R.C. § 6901 (2018). The other six Original Trusts were terminated by 2012 and assets distributed to

1

that the Internal Revenue Service ("IRS") collected pursuant to its determination that plaintiffs were liable under I.R.C. § 6901 (2018) as transferees of Humboldt Shelby Holding Corporation ("HSHC").[2]

Plaintiffs raise several arguments in these consolidated refund suits. Most importantly, plaintiffs assert that they are entitled to a refund of all taxes, penalties, and interest paid because they are not liable as transferees under § 6901. Even if they were liable as transferees, however, plaintiffs contend they are still entitled to certain refunds. Specifically, plaintiffs argue that their transferee liabilities cannot include HSHC's gross valuation misstatement penalty, because they lacked knowledge of HSHC's plan to carry out the tax shelter scheme that formed the basis of the I.R.C. § 6662 penalty. Plaintiffs also argue that underpayment interest on HSHC's tax deficiency should not have accrued beyond May 8, 2015, the date when the IRS posted plaintiffs' I.R.C. § 6603 deposits. (As will be discussed below, § 6603(b) provides for the suspension of underpayment interest from the date a deposit is made, "to the extent such deposit is used by the Secretary to pay tax.") It is this last interest-related claim which is the subject of defendant's pending dispositive motion.

With trial set for January 2023, defendant has moved for partial dismissal for lack of subjection matter jurisdiction, or in the alternative, for partial summary judgment,[3] solely with respect to plaintiffs' interest-related claim. For this claim, plaintiffs argue that § 6603 bars the continued running of underpayment interest when taxpayers make deposits and later request that the IRS use those deposits for

---

Successor Trusts. The parties agree that the liabilities of the terminated Original Trusts and their Successor Trusts will be determined as if they were also parties to this action. Appendix to Plaintiffs' Response ("App") 315. The Original and Successor Trusts together will be referred to as the Dillon Family Trusts.

[2] Plaintiffs filed separate complaints in December 2017, and defendant answered each in March 2018. The three cases were consolidated in August 2018.

[3] Although defendant has moved for partial dismissal under both RCFC 12(b)(1) and 12(b)(6), a 12(b)(6) motion for failure to state a claim is inappropriate when the court is presented with matters outside the pleading and the court has not excluded them. *See* RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56."). Because plaintiffs have presented matters outside the pleadings, we consider this motion to be for partial dismissal for lack of subject matter jurisdiction, or in the alternative, for partial summary judgment.

tax payments. Plaintiffs thus seek a refund of the underpayment interest that they paid for the period *after* they made their § 6603 deposits, alleging that IRS's collection of interest violated § 6603. Defendant, however, seeks dismissal of this claim on the ground that the United States has not waived sovereign immunity for the relief plaintiffs seek. Defendant further argues that plaintiffs are not entitled to a refund as a matter of law, because the IRS returned their deposits without using them as payments for tax and § 6603 mandates suspension of interest only when the IRS uses a deposit for tax payment.

Defendant filed its motion on October 6, 2022, and plaintiffs filed their response on October 21, 2022. Oral argument was heard on November 2, 2022. For the foregoing reasons, we DENY the motion for partial dismissal for lack of subject matter jurisdiction and GRANT the motion for partial summary judgment.

## BACKGROUND[4]

### I. Notice of Potential Transferee Liabilities and Making of § 6603 Deposits

By the end of August 2014, HSHC was subject to a federal income tax deficiency of $25,617,887 and a gross valuation misstatement penalty of $10,247,155, plus interest, which remained unpaid.[5] Stip. ¶ 89. In letters dated November 20, 2014, the IRS notified each of the nine original Dillon family trusts ("Original Trusts") that they might be held liable as transferees under § 6901 for HSHC's unpaid liabilities. Appendix to Plaintiffs' Response ("App") 1-86. Acting on behalf of all Dillon Family Trusts, Dillon Trust Company informed the IRS that six of the Original Trusts had terminated and provided a list of Successor Trusts that

---

[4] The facts are taken as alleged from the following: (1) plaintiffs' complaints ("Compl. 709204," "Compl. 709210," "Compl. 8545"); (2) the complaint filed in *Dillon Tr. Co. LLC v. Koskinen*, No. 1:17-CV-01571 (D. Colo. June 27, 2017) ("Mand. Compl."); (3) the parties' stipulation of facts ("Stip."); (4) plaintiffs' pretrial memorandum of fact and law ("Mem."); (5) the appendix to plaintiffs' response to the pending motion ("App.").

[5] The IRS first issued a statutory notice of deficiency to HSHC on August 14, 2007, having determined the deficiency and penalty as stated for the tax year ending on November 30, 2003. A Tax Court proceeding followed in which HSHC contested its liability, and the Tax Court upheld the Commissioner's decision. *See Humboldt Shelby Holding Corp., v. Comm'r*, T.C. Memo, 2014-47 (2014), *aff'd, Humboldt Shelby Holding Corp. & Subsidiaries v. Comm'r*, 606 Fed. Appx. 20 (2d Cir. 2015).

3

would be liable for any assessments made against the terminated trusts. *See* App. 95.

On May 4, 2015, while the IRS examination was still ongoing, Dillon Trust Company sent the IRS a single check for $71,741,583.28, which was marked as a "deposit." *See* App. 98. The letter enclosed with the check reiterated that the check is "designated a deposit and is not intended as a payment of tax." *Id*. at 95 The stated purpose in "enclosing a deposit as provided under IRC Section 6603 and Rev. Proc. 2005-18" was to "stop the accrual of interest" on HSHC's underlying liabilities in the event that the Original Trusts were held liable as transferees. *Id*.

Given the Successor Trusts' assumption of liabilities for the terminated Original Trusts, Dillon Trust Company intended the $71.7 million to be posted as separate deposits for thirty different taxpayer accounts (two Original and twenty-eight Successor Trusts) to cover each of their potential liabilities. The same letter dated May 4, 2015, therefore instructed the IRS to distribute the $71.7 million according to an attached allocation schedule. App. 95, 97. According to the deposition testimony of IRS Agent Timothy Stern, however, the $71.7 million in deposit was ultimately "posted to the general ledger account and not the [individual] taxpayer's account [for each trust]" on May 8, 2015. *See id*. at 324; Compl. 709204 ¶ 82.

## II.     Requesting Use of § 6603 Deposits as Payments for Transferee Liabilities

On October 25, 2016, the IRS issued statutory notices of liability to each Original Trust, whereby each trust was assessed with a portion of HSHC's income tax deficiency, penalty, and underpayment interest that was still running. *See* App. 157-160. For terminated trusts, notices were issued to the Original Trust rather than its Successor Trusts. *See id*. HSHC's underlying liabilities totaled $68,511,826.68 by then, $32,646,784.68 of which was in interest accrued as of October 17, 2016. *Id*. at 166.

In addition to filing protests seeking a hearing with IRS Appeals, Dillon Trust Company requested on behalf of all Dillon Family Trusts that the IRS use portions of the § 6603 deposits as payments for some of the assessed liabilities. *See id*. at 207. Relying on the allocation schedule previously provided to the IRS, Dillon Trust Company requested in writing on January 20, 2017, that: (1) $19,707,494 be paid for Trust 8454, taken from four Successor Trusts' deposits; (2) $248,655 be paid for Trust 709204, taken from a Successor Trust's deposit as well as its own; (3) $249,655 be paid for Trust 709210, taken from a Successor Trust's deposit as well as its own. *Id*. at 208. The letter also clarified that the "remaining amount of the Dillon deposit, $52,168,338 should remain as a deposit." *Id*. at 209.

would be liable for any assessments made against the terminated trusts. *See* App. 95.

On May 4, 2015, while the IRS examination was still ongoing, Dillon Trust Company sent the IRS a single check for $71,741,583.28, which was marked as a "deposit." *See* App. 98. The letter enclosed with the check reiterated that the check is "designated a deposit and is not intended as a payment of tax." *Id*. at 95 The stated purpose in "enclosing a deposit as provided under IRC Section 6603 and Rev. Proc. 2005-18" was to "stop the accrual of interest" on HSHC's underlying liabilities in the event that the Original Trusts were held liable as transferees. *Id*.

Given the Successor Trusts' assumption of liabilities for the terminated Original Trusts, Dillon Trust Company intended the $71.7 million to be posted as separate deposits for thirty different taxpayer accounts (two Original and twenty-eight Successor Trusts) to cover each of their potential liabilities. The same letter dated May 4, 2015, therefore instructed the IRS to distribute the $71.7 million according to an attached allocation schedule. App. 95, 97. According to the deposition testimony of IRS Agent Timothy Stern, however, the $71.7 million in deposit was ultimately "posted to the general ledger account and not the [individual] taxpayer's account [for each trust]" on May 8, 2015. *See id*. at 324; Compl. 709204 ¶ 82.

## II.     Requesting Use of § 6603 Deposits as Payments for Transferee Liabilities

On October 25, 2016, the IRS issued statutory notices of liability to each Original Trust, whereby each trust was assessed with a portion of HSHC's income tax deficiency, penalty, and underpayment interest that was still running. *See* App. 157-160. For terminated trusts, notices were issued to the Original Trust rather than its Successor Trusts. *See id*. HSHC's underlying liabilities totaled $68,511,826.68 by then, $32,646,784.68 of which was in interest accrued as of October 17, 2016. *Id*. at 166.

In addition to filing protests seeking a hearing with IRS Appeals, Dillon Trust Company requested on behalf of all Dillon Family Trusts that the IRS use portions of the § 6603 deposits as payments for some of the assessed liabilities. *See id*. at 207. Relying on the allocation schedule previously provided to the IRS, Dillon Trust Company requested in writing on January 20, 2017, that: (1) $19,707,494 be paid for Trust 8454, taken from four Successor Trusts' deposits; (2) $248,655 be paid for Trust 709204, taken from a Successor Trust's deposit as well as its own; (3) $249,655 be paid for Trust 709210, taken from a Successor Trust's deposit as well as its own. *Id*. at 208. The letter also clarified that the "remaining amount of the Dillon deposit, $52,168,338 should remain as a deposit." *Id*. at 209.

The IRS, however, had not applied any of the deposits as payments for the Original Trusts' liabilities by March 2017. *See* App. 211. Upon Dillon Trust Company's query, IRS Agent Timothy Stern addressed the discrepancies between the trusts that owed the liabilities and the trusts making the deposits, and explained orally that "the Service's procedures do not authorize a person to direct the Service to apply a deposit to pay another person's liability." *See id*. at 218. He also advised Dillon Trust Company to make a request in writing for the return of the deposits so that plaintiffs could make payments with the returned money. *See id*.; Mand. Compl. ¶ 31.

### III. Requesting Return of § 6603 Deposits

On March 16, 2017, Dillon Trust Company requested in writing that the IRS return $19,770,229.68 of deposits, which represented the sum of just four Successor Trusts' deposits. App. 218. Dillon Trust Company also filed an IRS Form 911 on April 6, 2017, seeking the assistance of the Taxpayer Advocate for the immediate return of those deposits and stay of any collection action. Mand. Compl. ¶ 35; *see also* App. 245.

By the end of May 2017, the IRS had not returned the requested deposits. It notified plaintiffs on May 29, 2017, however, that deposits for Trust 709204 and Trust 709210 had been applied as payments for their respective liabilities as of May 13, 2017—but no other deposits were applied as payments. *See* Compl. 709204 ¶ 63; Compl. 709210 ¶ 60; App. 245. Despite its letter on January 20, 2017, that had requested such use of the deposits for payments, Dillon Trust Company considered the IRS's use as "erroneous[]" at this time, because the 911 form it filed "should have stayed all collection action." App. 245; *see also* Mand. Compl. ¶ 38. Faced with the "threat of collections actions," Pls' Resp. 8, Dillon Trust Company filed a mandamus action against the IRS on June 27, 2017, seeking the return of the four Successor Trusts' deposits it had already requested. Mand. Compl. ¶ 11.

On July 31, 2017, the mandamus action was voluntarily dismissed without prejudice after the IRS agreed to return the deposits. Four days later, on August 4, 2017, the IRS returned the requested $19.8 million in deposits. *See* App. 279. Then, on August 28, 2017, Dillon Trust Company requested in writing that the IRS return the remaining deposits of $51,536,779.28.[6] *Id*. The IRS returned the remaining deposits on October 6, 2017, in addition to paying $1,056,892.98 in interest. *See*

---

[6] Plaintiffs' calculations of the remaining deposits did not include the two deposits of $217,287.16 that the IRS had already used as payments for Trust 709204 and 709210. *See* App. 280.

5

Pls' Resp. 9; Mem. 39.

### IV. Payment of Transferee Liabilities, Including Underpayment Interest

Once the requested deposits were returned, Dillon Trust Company paid in full for transferee liabilities assessed against the Original Trusts. Over $18 million was paid on August 9, 2017, and over $ 61 million was paid on October 13, 2017, with an additional $4 million paid later. *See* App. 263, 292, 294.

Because the IRS did not stop underpayment interest on HSHC's underlying liabilities as of May 8, 2015, the date plaintiffs' § 6603 deposits were posted, plaintiffs allege that they paid $11,306,496 in interest that they did not owe. *See* Mem. 40. Allowing for the interest the IRS paid on the returned deposits, plaintiffs now seek the difference between the $11 million of excess interest they paid and the $1 million of statutory deposit interest they received. Pls' Resp. 14.

## DISCUSSION

### A. Partial Dismissal for Lack of Subject Matter Jurisdiction

Defendant argues that plaintiffs' interest claim must be dismissed under RCFC 12(b)(1) because this court's jurisdiction depends wholly upon the extent to which the United States has waived its sovereign immunity to suit, and no such waiver exists here. Defendant cites *Schortmann v. United States*, 82 Fed. Cl. 1 (2008) and argues that while "I.R.C. § 6611 waives the United States' sovereign immunity to authorize the allowance of interest on tax overpayments," § 6611 does not "authorize[], let alone mandate[], the conversion of a deposit into a payment at the taxpayer's request." Mot. To Dismiss 7.

Plaintiffs respond that this court has subject matter jurisdiction because I.R.C. § 7422 waives sovereign immunity for tax refund suits. *See* I.R.C. § 7422(a) (requiring a claim of refund to be filed with the Secretary before instituting a suit in any court "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . or any sum alleged to have been excessive or in any manner wrongfully collected"); I.R.C. § 6601(e)(1) (providing that any reference to "tax" under the I.R.C. "shall be deemed also to refer to interest imposed by this section on such tax"). Plaintiffs further cite 28 U.S.C. § 1491 (2018) as granting this court jurisdiction over "any claim against the United States founded either upon . . . any Act of Congress."

It is well-established that courts lack subject matter jurisdiction in suits against the federal government unless the United States has waived sovereign

immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976) ("United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal quotations omitted). The "no-interest" rule addressed in *Schortmann* is a specific assertion of sovereign immunity, which recognizes that the United States is immune from suits that seek an interest award as part of damages unless there is express congressional authorization. *Schortmann*, 82 Fed. Cl. at 5. The no-interest rule does not apply here, however, because seeking interest on overpayment—as was the case in *Schortmann*—is not the same as alleging that interest charged by the government was improper. *See, e.g., Libr. of Cong. v. Shaw*, 478 U.S. 310, 314 (1986) (explaining that the "requirement of a separate waiver [for an interest award] reflects the historical view that interest is an element of damages separate from damages on the substantive claim"); *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1125 (Fed. Cir. 2004) ("We hold that the Oil Companies have not demonstrated a waiver of sovereign immunity for post-judgment interest on final judgments against the United States . . . .").

The inapplicability of the no-interest rule, however, does not remove other hurdles to subject matter jurisdiction. For this court, which derives its jurisdiction from the Tucker Act, these hurdles principally involve whether there is a source of law outside the Tucker Act that creates the right to payment from the federal government. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[T]he absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act."). A separate source of law is necessary because although the Tucker Act waives sovereign immunity, it does not create any substantive right enforceable against the United States for monetary relief. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009); *see* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ."). Our subject matter jurisdiction therefore turns on how "other sources of law (e.g. statutes or contracts)" provide the substantive basis for the monetary relief that parties seek. *See Navajo Nation*, 556 U.S. at 290.

Where that other source of law is not a contract with the government, two types of claims fall within the jurisdictional provision of the Tucker Act: a claim for illegal exaction or a claim under a money-mandating statute. *See Boeing Co. v. United States*, 968 F.3d 1371, 1382 (Fed. Cir. 2020). The distinction between the two lies not only in the necessary facts but also the underlying legal theory, to the extent that they are considered "flip side[s]" of each other. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1579 (Fed. Cir. 1996) (Nies, J., concurring).

In an illegal exaction claim, the plaintiff has already "paid money over to the

7

Government, directly or in effect" and seeks the "return of all or part of that sum." *Eastport S.S. Corp., v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)); *see also Testan*, 424 U.S. at 400 (endorsing the *Eastport S.S. Corp.* formulation of different Tucker Act claims). The plaintiff alleges, in other words, that "the value sued for was improperly paid, exacted or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport,* 372 F.2d at 1007. In a money-mandating statute claim, on the other hand, "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury" because "the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id*.

For subject matter jurisdiction to exist over a money-mandating statute claim, the statute that is relied upon must be amenable to "fair interpretation" as mandating compensation by the federal government. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). It was thus long assumed that an illegal exaction claimant must also "demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)) (internal quotations omitted). The Federal Circuit has clarified in *Boeing Company*, however, that the "money-mandating" jurisdictional requirement does not apply to illegal exaction claims, because such a requirement would erase the distinction between the two types of claims. *Boeing Co.*, 968 F.3d at 1384 ("The [*Norman*] court's statement thus was not addressing an illegal exaction of the sort Boeing alleges . . . . Boeing's claim falls under the *Eastport S.S.* category for which the 'money-mandating' standard need not be met."). Thus, for subject matter jurisdiction to exist over an illegal exaction claim, all that is required is that "a party that has paid money over to the government and seeks its return . . . make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Id*. at 1383.

The non-frivolous allegation standard is a relatively low standard. The illegal exaction claim need only "exceed a threshold that has been equated with such concepts as essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit." *Boeing Co.*, 968 F.3d at 1383 (quoting *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015)) (internal quotations omitted). Moreover, adverbs such as "wholly" and "obviously" in this context are "no mere throwaways" and have "cogent legal significance." *Shapiro*, 577 U.S. 39 at 46. Nor does this inquiry require the court to determine whether the complaint states "a nonfrivolous claim *on the merits*." *See Jan's Helicopter Serv., Inc., v. Fed. Aviation Admin*., 525 F.3d 1299, 1309 (Fed. Cir. 2008) (emphasis added); *see Aerolineas Argentinas*, 77 F.3d at 1574 (explaining that plaintiffs' failure to "establish that the exaction was

8

contrary to law" does not "deprive the court of jurisdiction" because such a finding is an "adjudication on the merits").

As a threshold matter, plaintiffs' claim here is better characterized as an illegal exaction claim than a money-mandating statute claim. An illegal exaction claim presupposes an exaction, which exists in this case. The IRS has already collected underpayment interest from plaintiffs for the period at issue. Neither does the possibility of reading the refund suit provision of the I.R.C. as a money-mandating statute change the essential nature of plaintiffs' claim that the exaction was illegal.[7] Indeed, because I.R.C. § 7422(a) contemplates refund suits only for tax alleged to have been "erroneously or illegally assessed or collected," § 7422 operates more like a procedural statute that allows refund suits when plaintiffs can establish erroneous or illegal collection under another provision of law. In other words, refund suits such as the plaintiffs' necessarily require establishing illegal exaction.

Taking the allegations stated in the complaint as true, *see Aerolineas* 77 F.3d at 1572, we hold that plaintiffs have met the threshold for making a non-frivolous allegation of an illegal exaction claim. Here, plaintiffs allege that over $71 million of deposits were posted on May 8, 2015, that the IRS held them until their two-part return in August and October 2017, and that the IRS violated § 6603 by failing to suspend underpayment interest as of the date the deposits were posted, so that plaintiffs paid over $11 million in interest that they did not owe.

Such allegations are not "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit." We therefore have subject matter jurisdiction over plaintiffs' claim, and we deny defendant's motion to dismiss.

## B. Partial Summary Judgment

Defendant moves in the alternative for partial summary judgment, arguing that the material facts are undisputed and that plaintiffs are not entitled to a refund of their interest payment as a matter of law. Defendant maintains that § 6603 mandates interest suspension only when the IRS uses a deposit for payment of tax and that plaintiffs cannot benefit from such a suspension without retroactive treatment of their deposits as having been applied as tax payments—a power that defendant argues this court lacks.

---

[7] Nonetheless, because I.R.C. § 7422 may fairly be read as a money-mandating statute, this court would have subject matter jurisdiction under the Tucker Act even if we were to treat plaintiffs' claim as a money-mandating statute claim rather than an illegal exaction claim.

9

Plaintiffs respond that defendant, first of all, mischaracterizes their claim as requiring retroactive treatment of deposits as payments of tax. What they seek, rather, is a determination that the IRS improperly collected interest while the deposit was in its possession. To complete their argument, plaintiffs further contend that the IRS refused without legal grounds to use the deposits for tax payment. Although plaintiffs' response points out many facts not included in defendant's statement of the undisputed material facts, defendant asserts that any dispute is over the characterization of the facts or their materiality, rather than the facts in themselves. Because materiality refers to whether a fact "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), we turn to the governing law to determine which facts are material and whether defendant is entitled to judgment as a matter of law under the undisputed material facts. *See* RCFC 56(a).

To begin, the issue here is not whether this court may retroactively treat a deposit the IRS returned as having been used for a payment of tax. Rather, the proper question is whether the IRS violated the law by exacting underpayment interest when it was forbidden from doing so. Without a finding of illegality on the part of the IRS, plaintiffs cannot succeed on the merits of their illegal exaction claim. *See Aerolineas*, 77 F.3d at 1574 (explaining that an adjudication on the merits for an illegal exaction claim requires considering "whether the authorization on which the [agency] relies was misinterpreted, misapplied, or invalid"); I.R.C. § 7422(a) (referring to civil actions for refunds where taxes were "illegally assessed or collected" or any sum was "in any manner wrongfully collected"); *Illegal*, BLACK'S LAW DICTIONARY (11th ed., 2019) (defining "illegal" as "[f]orbidden by law"). We thus address each provision of law that might establish the necessary illegality.

As a general matter, the IRS has the statutory authority to collect underpayment interest under I.R.C. § 6601(a). *See* I.R.C. § 6601(a) (mandating underpayment interest "[i]f any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment"). The rate of interest is established by § 6621, and such interest must be paid from the last date prescribed for the payment of tax to the date actually paid. I.R.C. § 6601(a).

The IRS, however, may not collect underpayment interest in circumstances described under I.R.C. § 6603, which has several relevant subsections. First, §6603(a) permits a taxpayer to make a "cash deposit" with the IRS for any tax that has "not been assessed at the time of the deposit." Once a taxpayer makes a deposit as authorized by § 6603(a), underpayment interest is effectively suspended from the date of the deposit "to the extent such deposit is used by the Secretary to pay tax." § 6603(b) (providing that "the tax shall be treated as paid when the deposit is made"). To the extent the IRS does *not* use a deposit as a tax payment, § 6603(c)

requires the IRS to return any amount of the deposit that the taxpayer requests in writing. § 6603(c) ("Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing."); *see also* Rev. Proc. 2005-18 § 6.91 ("A deposit made pursuant to section 6603 is not subject to a claim for credit or refund as an overpayment until the deposit is applied by the Service as payment of an assessed tax of the taxpayer. A taxpayer may request the return of all or part of a deposit at any time before the Service has used the deposit for payment of a tax.").

Certain logical conclusions follow from the plain language of these statutory provisions. First, a deposit is *not* a tax payment until and unless the IRS uses the deposit for a payment—these provisions would make no sense if a deposit was in fact the functional equivalent of a tax payment, regardless of whether the IRS used it for such a purpose. Plaintiffs' argument that they "cannot have been delinquent for the period of time that they had $71 million in Cash Deposits with the IRS against a $68 million liability," Pls' Resp. 16, is thus untenable. Second, if the IRS does not use any portion of a deposit to pay tax, no interest-suspension benefit is triggered under § 6603(b). Indeed, § 6603(b) makes clear that it is only "[t]o the extent such deposit is used by the Secretary to pay tax" that underpayment interest must be suspended. A taxpayer therefore has no statutory entitlement to a suspension of underpayment interest if the IRS does not actually use a deposit for a payment of tax.

Third, § 6603 does not require the use of deposits as tax payments, whether as a result of the IRS making an assessment or a taxpayer requesting the deposit to be used. Whereas other subsections of § 6603 mandate a certain outcome through the use of "shall," § 6603(a) is pointedly permissive: "A taxpayer *may* make a cash deposit with the Secretary which *may* be used by the Secretary to pay any tax imposed under subtitle A or B or chapter 41, 42, 43, or 44 which has not been assessed at the time of the deposit." (emphasis added). The decision to use a deposit for a payment of tax is thus subject to IRS discretion, and the statute does not limit such discretion with conditions or exceptions. There is, for instance, no provision comparable to §6603(c) that requires the IRS to use a deposit as a tax payment upon the taxpayer's request in writing.

At best, Revenue Procedure 2005-18 § 4.02 provides for § 6603 deposits to be "posted to the taxpayer's account as payment of tax upon the expiration of the 90 or 150-day period" after a taxpayer has received a notice of deficiency. This procedure, however, cannot establish illegality on the part of the IRS for not using the deposits as payments of tax in this case. Above all, IRS revenue procedures do not "confer substantive rights on taxpayers." *Giambrone v. Comm'r*, T.C. Memo. 2020-145, *9 (2020); *see also Fed. Nat'l Mortg. Ass'n v. United States*, 379 F.3d

11

1303, 1308 (Fed. Cir. 2004) (holding that the Revenue Procedure at issue was "of the nature of an enforcement guideline—not a legislative-like interpretation—and thus ineligible for *Chevron* treatment"); *Est. of Shapiro v. Comm'r*, 111 F.3d 1010, 1017 (2d Cir. 1997) ("[T]he failure to comply with [a] Revenue [Procedure] . . . is not dispositive, as IRS procedures are mere guidelines without force of law.") (internal quotations omitted).

Even if IRS procedures could confer substantive rights, this procedure does not in any event contemplate a taxpayer's request as obligating the IRS to use a deposit for tax payment. In fact, it provides only for a taxpayer's ability to request that a deposit continue to be a deposit: the application of deposits as payments is *automatic* at the end of the 90 or 150-day period "unless the taxpayer . . . requests in writing before the expiration of that period that the deposit continue to be treated as a deposit . . . ." Rev. Proc. 2005-18 § 4.02. As for IRS's failure to automatically apply the Successor Trusts' deposits to the Original Trusts' liabilities in this case, the IRS explained to Dillon Trust Company that it could only use the deposits as tax payments when the taxpayer who owes the liability made the deposit. *See* I.R.S. Off. of Chief Couns. Mem. 20171801F (May 5, 2017) ("While a person making a deposit may direct the Service to use the deposit as payment of other of his liabilities, Rev. Proc. 2005-18 does not authorize a person to direct the Service to apply a deposit to pay another person's liability."). The IRS did not, at any rate, violate a provision of law that mandated the use of plaintiffs' deposits for tax payments.

Plaintiffs find fault with the IRS, nonetheless, for the inevitable discrepancies in this case between the taxpayers who made the deposits and the taxpayers who owed the liabilities. Plaintiffs assert that if the IRS had issued the statutory notices of liabilities to the Successor Trusts instead of the terminated Original Trusts, there would have been no administrative impediment to applying the deposits as payments. Pls' Resp. 6. They characterize the failure to do so as the "first mistake" the IRS made, once again citing internal guidance that directs the IRS to issue notices of deficiency for a terminated entity to the entity's successor in interest. *Id*. at 4; *see also* I.R.S. Field Serv. Advisory 200036022, 2000 WL 33119638. Plaintiffs then argue that this "first mistake" led directly to the IRS's "second mistake" of refusing to use the deposits as tax payments. Pls' Resp. 6.

Such an argument involving a series of "mistakes" fails to show, however, that the IRS violated the law in collecting underpayment interest—especially since the Field Service Advisory plaintiffs rely on states that it is "not to be cited as precedent." *See also Chai v. Comm'r*, 851 F.3d 190, 220 (2d Cir. 2017) ("Of course, the IRS's internal guidance is neither legally binding nor entitled to more deference than its persuasive value."); *United States v. Mead Corp.*, 533 U.S. 218, 234 (holding that Customs classification rulings made without notice-and-comment procedures are comparable to "interpretations contained in policy statements,

12

agency manuals, and enforcement guidelines" that lack "force of law"). If anything, plaintiffs' argument effectively morphs into a claim for the abatement of interest attributable to unreasonable errors and delays by the IRS, a claim over which this court lacks subject matter jurisdiction. *See* I.R.C. § 6404(e); *Hinck v. United States*, 550 U.S. 501, 503 (2007) (holding that the Tax Court provides the exclusive forum for judicial review of a failure to abate interest under § 6404(e)(1)).

Even so, plaintiffs find it unacceptable that the IRS could be vested with discretion "so broad as to allow [it] to reap a windfall from its own bureaucratic incompetence or intransigence or both." Pls' Resp. 17. Yet Congress can and does sometimes vest agencies with discretion so broad that some agency decisions are considered "committed to discretion by law" and not even judicially reviewable. 5 U.S.C. § 701(a)(2) (2018). Where judicial review is not available, courts may *not* set aside the discretionary decisions as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). Although plaintiffs do not bring their claim here under the Administrative Procedure Act ("APA"),[8] case law involving "discretion by law" under § 701(a)(2) is instructive for showing the kind of statutory language necessary to limit agency discretion.

To be sure, courts interpret "agency discretion by law" narrowly, "restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce*, 139 S. Ct. at 2568 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 370 (2018)) (internal quotations omitted). For instance, the use of the word "may" is not sufficient to commit an agency's decision to discretion by law. *See Weyerhaeuser Co.*, 139 S. Ct. at 371; *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021) ("But permissive language, alone, does not render a question committed to agency discretion under 5 U.S.C. § 701(a)(2)."). If a statute—whether in the same subsection or in others—sets forth relevant factors to guide the agency in the exercise of its discretion, the agency's discretion is limited even if permissive language is used. *See In re Vivint*, 14 F.4th at 1351 (rejecting agency discretion by law where the relevant statute provides that the agency "may take into account whether . . . the same or substantially the same prior art or arguments previously were presented"); *Weyerhaeuser Co.*, 139 S. Ct. at 371 (rejecting agency discretion by law because the Endangered Species Act requires the Secretary to "consider the economic and other impacts of designation when making his [discretionary] exclusion decisions"). Here, however, § 6603 does not set forth any factors that constrain IRS discretion on whether to use a taxpayer's

---

[8] We therefore need not consider whether the IRS's decision is even judicially reviewable.

deposit for payment of tax.[9]

The same is true of IRS discretion in the time it takes to return a deposit upon the taxpayer's request. At oral argument, plaintiffs contended that it was unlawful for the IRS to collect interest while it delayed the return of the deposits they requested. *See* Oral Arg. Tr. 26. According to plaintiffs, if the IRS has returned the deposits immediately when the request was made in March 2017, they could have paid their liabilities earlier and thus stopped interest sooner than August 2017. *See id*. Even if we were to assume that chain of event, however, this court could not find the IRS "delay" of five months to have violated the law. Although § 6603(c) makes it nondiscretionary for the IRS to return any deposit when a taxpayer makes a request in writing before the deposit is used for tax payment, it does not prescribe a timeline for the IRS in returning the deposits. For instance, § 6603(c) does not enumerate the number of days or months in which the IRS must return the deposits, nor does it use time-sensitive phrases such as "immediately" or "within a reasonable time." *See* § 6603(c) ("Except in a case where the Secretary determines that collection of tax is in jeopardy, the Secretary shall return to the taxpayer any amount of the deposit (to the extent not used for a payment of tax) which the taxpayer requests in writing."). This court therefore could not determine when the IRS should have returned the deposits under the law—in thirty days, sixty days, or ninety days?—such that any delay past that point would make the collection of underpayment interest illegal.

Against this backdrop, no provision of law allows for a finding of illegality necessary to support plaintiffs' illegal exaction claim.[10] For the IRS collection of underpayment interest here to have violated the law, one of two things must have been true: either the I.R.C. mandates applying a deposit as a tax payment when the taxpayer makes such a request (thus triggering interest suspension under § 6603(b)), or the I.R.C. requires suspension of interest when a § 6603 deposit is made, *even if the Secretary does not use the deposit for a payment of tax*. The plain language of the I.R.C. does not allow for either result.

---

[9] Plaintiffs also cite no Treasury Regulation that limits IRS discretion in this regard.

[10] The record leaves unclear whether the IRS suspended underpayment interest to the extent it applied the two separate deposits of $217,287.16 as payments for Trust 709204 and 709210's liabilities in May 2017. Because these deposits were used for tax payments, the IRS would have violated § 6603(b) if it did not suspend interest for such amounts from the date the deposits were made. The overwhelming majority of plaintiffs' deposits were not applied as payments, however, and where those deposits are concerned, we hold that the IRS collection of interest for the period at issue did not violate the law.

14

We thus hold that defendant is entitled to judgment as a matter of law because, under the undisputed material facts, the IRS's collection of interest for the period at issue did not violate the law.

## CONCLUSION

For the foregoing reasons, defendant's motion for partial dismissal for lack of subject matter jurisdiction is DENIED while the motion for partial summary judgment is GRANTED.

s/Eric G. Bruggink<br>
Eric G. Bruggink<br>
Senior Judge