# In the United States Court of Federal Claims

Nos. 17-1898T, 17-2022T, 17-2023T
(Issued: October 31, 2023)

* * * * * * * * * * * * * * * * * * * * * * * *

DILLON TRUST COMPANY LLC, et al.,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * *

Lawrence M. Hill, Steptoe & Johnson LLP, Washington, DC, with whom were *Julia L. Gatto*, *Steven R. Dixon*, *Caitlin R. Tharp*, *Nicholas J. Sutter, Ida Adibi*, for plaintiffs.

Joseph A. Sergi, Attorney of Record, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *Dara B. Oliphant*, Assistant Chief, Civil Trial Section – Central, *Margaret E. Sheer*, Trial Attorney, *Jeffrey N. Nuñez*, Trial Attorney, *Ryan O. McMonagle*, Trial Attorney, *Emily K. Miller*, Trial Attorney, for defendant.

<u>OPINION</u>

BRUGGINK, *Judge*.

This is a consolidated group of cases brought by the Dillon Trust Company LLC, as trustee for Trust 709204, Trust 709210, and Trust 8545. Each trust was formed during the 1930s by Clarence Douglas Dillon and his wife, Anne D. Dillon, who created numerous trusts for the benefit of their descendants ("Dillon trusts"). Plaintiffs seek a refund of the taxes, penalties, and interest that the Internal Revenue Service ("IRS") collected pursuant to

its determination that plaintiffs were liable as transferees of Humboldt Shelby Holding Corporation ("HSHC") under I.R.C. § 6901 (2018).

At the beginning of the current millennium, the Dillon trusts were in an enviable position. The assets held by the trusts had appreciated in value to approximately $90 million. The trusts owned to varying degrees the stock of two C corporations, Humboldt Corporation ("Humboldt") and Shelby Corporation ("Shelby").[1] These corporations actually owned the assets consisting almost entirely of blue-chip stocks and prime farmland. A new generation of beneficiaries were ready, however, to pass the value of the assets on to the individual trusts or their beneficiaries. That posed a problem: at that time, the two corporations had relatively low bases in those assets, approximately $16 million, leaving over $71 million in unrealized gains. Disposing of the assets and distributing the proceeds therefore meant paying a very substantial tax, not just at the corporate level when the assets were sold, but then a second time when the corporations were dissolved and the assets distributed. The prospect of this dual taxation meant that the net benefit could be reduced almost in half. This case involves the fallout from the trusts' efforts to minimize that tax effect. The question posed is whether the efforts stayed within the legitimate means available under the law, or, as the IRS insists, the plaintiffs violated the tax laws.

We set out here a brief summary of the facts in order to frame up a more detailed factual presentation below and in order to tee up the relevant tax issues. Although the facts are complex, what they lead to is the Dillon trusts' sale ("Stock Sale") on December 23, 2002, of the Humboldt and Shelby corporations to Humboldt Shelby Holding Company ("HSHC"), a newly created third party entity. By the time of the Stock Sale, Humboldt and Shelby had liquidated their physical assets and were no longer operating businesses; each corporation retained only cash, a portfolio of blue-chip stocks ("investment portfolios"), and high-quality installment notes whose principal payments were due in three years. HSHC was incorporated less than a month before the Stock Sale. Its sole shareholder and president was James Haber. In exchange for 100% of the stock of Humboldt and Shelby, HSHC paid $86.8 million in cash to the nine Dillon trusts, approximately 95% of the fair market value of the assets, using monies borrowed from Rabobank.

---

[1] Humboldt was owned by nine Dillon trusts, whereas Shelby was owned by Humboldt and two Dillon trusts (which also owned Humboldt). Plaintiffs in this action, Trust 709204, Trust 709210, and Trust 8545, are three of the nine Dillon trusts that owned Humboldt.

As a result of the Stock Sale, Humboldt and Shelby passed on to HSHC significant unrealized gains on the underlying assets. Within hours of the stock sale, HSHC sold Humboldt and Shelby's investment portfolios to UBS PaineWebber, triggering substantial realized, taxable gains to the corporations. In January 2003, HSHC pledged one of the Humboldt and Shelby installment notes to Rabobank in exchange for an additional loan. In the meantime, between December 24, 2002, and May 5, 2003, Haber caused Humboldt and Shelby to engage in a series of financial transactions (known as "Son-of-BOSS transactions") that generated losses to offset the gains. The parties agree that those loss-generating transactions were entirely bogus. The Dillon trusts were not participants in any part of the Son-of-BOSS transactions.

On August 14, 2004, HSHC, as the common parent of the affiliated group of corporations including Humboldt and Shelby, filed a consolidated corporate income tax return for the tax year beginning December 23, 2002, and ending November 30, 2003 ("2003 Consolidated Return"). The 2003 Consolidated Return reported $73.2 million in gains ($42.9 million from the sale of the investment portfolios and $30.3 million from the sale of the three installment notes) and $74.1 million in losses, which theoretically offset any tax liability for the gains.

On August 14, 2007, the IRS issued a statutory notice of deficiency to HSHC based on the 2003 Consolidated Return. Specifically, the IRS determined that the Son-of-BOSS transactions were abusive tax shelters designed to create artificial losses and that HSHC owed $25.6 million in income tax and $10.2 million as a gross valuation misstatement penalty, along with underpayment interest. The U.S. Tax Court upheld the Commissioner's decision, *see Humboldt Shelby Holding Corp. v. Comm'r*, T.C. Memo. 2014-47 (2014), and the Second Circuit affirmed, 606 Fed. Appx. 20 (2d Cir. 2015). HSHC never paid those taxes, interest, and penalties.

On November 20, 2014, the IRS notified the nine Dillon trusts that were parties to the Stock Sale that they might be held liable as transferees under I.R.C. § 6901 for HSHC's unpaid taxes, penalties, and interest. The Dillon Trust Company then made a $71.7 million deposit (which was not yet a payment) under I.R.C. § 6603 in the event that the IRS asserted transferee liability. The IRS did in fact assert such liability on October 25, 2016, issuing notices of transferee liability to the Dillon trusts that were parties to the Stock Sale. The Dillon trusts paid the assessed transferee liabilities in full, approximately $79.9 million, in October 2017.

In December 2017, the Dillon trusts filed suit in this court, seeking a refund of all taxes, penalties, and interest paid as purported transferees of HSHC.[2]  While discovery was ongoing, the parties jointly moved in June 2020 to pursue mediation.  Alternative dispute resolution proceedings followed, but the parties ultimately requested to return to the court's active docket in October 2021.  We held a hearing in January 2022 to determine whether the case needed to move forward to summary judgment or to trial. In light of disputed factual issues, the court ordered the parties to prepare for trial.

In November 2022, defendant moved for partial dismissal for lack of subject matter jurisdiction, or in the alternative, for partial summary judgment, solely with respect to plaintiffs' interest-related claim. Specifically, plaintiffs argued that alleged underpayment interest on HSHC's tax deficiency should not have accrued beyond May 8, 2015, the date when the IRS posted the Dillon trusts' I.R.C. § 6603 deposits.  We denied the partial motion to dismiss but granted the motion for partial summary judgment, holding that the continued accrual by the IRS of interest after plaintiffs made their § 6603 deposits did not violate the law, and therefore an illegal exaction claim could not be pursued.  *Dillon Trust Co. LLC. v. United States*, 162 Fed. Cl. 708 (2022), ECF No. 119.  Plaintiffs moved for reconsideration, which we denied.  *Dillon Trust Co. LLC v. United States*, 164 Fed. Cl. 92 (2023), ECF No. 150.

Trial followed: the first half took place from January 23 to February 1, 2023, and the second half, from March 9 to 15, 2023.  Post-trial briefing was completed, and closing arguments were heard on July 13, 2023.

<u>FACTUAL BACKGROUND</u>

## I.    The Dillon Family and Their Advisors

By 2000, there were four generations of Clarence and Anne Dillon's descendants, collectively referred to as the "Dillon family."   The Dillon

---

[2] Initially, nine Dillon trusts filed separate actions in this court.  But because the actions involved the same parties, the same operative facts, and the same legal issues and arguments, they were consolidated in August 2018.  Six were then voluntarily dismissed without prejudice in February 2019, leaving only Trust 709204, Trust 709210, and Trust 8545 as plaintiffs to this consolidated action.  The parties agree, however, that the liabilities of other Dillon trusts will be determined as if they were also parties to this action.

family was involved in events leading up to the sale of Humboldt and Shelby in several capacities.  First, Dillon family members were beneficiaries of the trusts that owned Humboldt and Shelby.  Second, some of the Dillon family members were directors of Humboldt and Shelby.  Third, some Dillon family members were trustees of the trusts that owned Humboldt and Shelby, alongside corporate trustees such as Brown Investment Advisory, CitiBank, and JP Morgan Chase.

Two Dillon family members, Mark Collins and Chris Allen, testified at trial as representatives of the family.  Collins is currently chairman of the Dillon Trust Company, which was formed in 2006 to serve as a corporate trustee for all Dillon trusts.  In the early 2000s, Collins was a co-trustee of multiple Dillon trusts and a director of both Humboldt and Shelby; he has an MBA and worked at Brown Investment Advisory as a partner.  Allen was a director of Humboldt; he has a JD and worked as a mergers and acquisitions advisor at Trenwith, an investment banking affiliate of BDO Seidman.

At the time, Keswick Management, Inc. ("Keswick") was the "family office" that provided accounting, investment, and advisory services to the Dillon trusts as well as to individual family members.  Crosby Smith was the Chairman of Keswick, and James Ruddy was its President.  Donald Barclay began working at Keswick in 2002 as Vice President.  Smith, Barclay and Ruddy testified at trial.

When asked what Keswick did for the Dillon family, Ruddy answered, "Pretty much everything . . . . We oversaw the assets.   We prepared income statements and balance sheets with regard to family members, trusts, anything that we – the family owned.  We reported to the family on a monthly basis, what their income was, what their expenses were, what their cash flow was . . . ."  Tr. 458.  Keswick thus had broad authority to act on behalf of the Dillon family and their trusts, apart from specific actions that required trustee approval.  (Smith and Ruddy were in fact co-trustees of several Dillon trusts, as well as officers and directors at Humboldt and Shelby.)

The Dillon family was also a longtime client of the international law firm, Shearman & Sterling.  Laurence Bambino was a partner in Shearman & Sterling's tax department who worked on tax aspects of merger and acquisition transactions.  Most of his clients were multinational companies. From the mid-1980s, Bambino was a part of the team at Shearman & Sterling

that advised the Dillon family;[3] the team included partners in other practice areas such as real estate and trusts and estates.  Bambino testified at trial.

Although Bambino was the tax attorney for the Dillon family, he did not prepare its tax returns.  *See* Tr. 1412 ("I believe they did that in-house."). He described his approach with his clients, including the Dillon family, as one of reacting to questions and addressing tax issues related to the transactions the family wanted to pursue.[4]  *See id.* at 1413.  He also testified that he would not have written a memorandum to his clients without speaking first to the Dillon family on the subject.  *See id.* at 1296 ("You don't want to write them and send them a memo that they say, we don't want this, we don't want to pay for this.  My guess is I would have spoken to them first and then put this together.")  Such communications took place primarily through Keswick.

## II.    The Sale of Dunwalke Farm and the Decision to Sell Humboldt Stock

Incorporated during the 1940s, both Humboldt and Shelby were C corporations that owned farms and other assets.  Humboldt owned farmland in Bedminster, New Jersey, on which cattle were raised ("Dunwalke Farm"), whereas Shelby owned farmland in Illinois and Iowa which supported production of corn and soybeans ("Shelby Farms").   The investment portfolios that Humboldt and Shelby each owned were meant to help fund the farming operations.

By 2000, the Dillon family faced several concerns regarding Humboldt.  First, unlike the Shelby farms in the Midwest, the cost of running the cattle operation on Dunwalke Farm was greater than the income it generated.   Second, the family did not know what would happen to the property located at the center of Dunwalke Farm, which Clarence Dillon had

---

[3] During the mid-to-late 80s, Bambino worked on transactions related to a company called Dillon Family Corporation and its wholly-owned subsidiary, Haut-Brion Wines.  Regarding those transactions, Bambino testified that "to avoid two levels of tax, we dissolved the Dillon Family Corporation."  Tr. 1285.

[4] Even though Ruddy was professionally experienced in tax planning as it relates to trusts and estates, he testified that he had no expertise in corporate tax and that the corporate tax planning advice Bambino provided was not something that he or anyone at Keswick was able to offer.  *See* Tr. 539.

donated to Princeton University to use for educational purposes in 1979 (the "Princeton Property"). The terms of the gift transferred ownership of the Princeton Property to the university in 2001, at which point it was free to sell the property if it wished. The Dillon family was worried about whether, and to whom, Princeton University might sell the Princeton Property in the future and how such a sale might affect the use of the rest of the adjacent Dunwalke Farm.

At the same time, the Dillon family was looking for ways to make Humboldt and Shelby more tax efficient. When asked about the questions that would come from the Dillon family during the 1990s, Bambino replied: "For example, can we convert the – Humboldt from a C corporation, which pays [corporate] tax, to an S corporation that doesn't pay [corporate] tax? . . . [I]s there another, you know, tax structure, like a spinoff or a conversion to a partnership that we could use to lower the tax . . . on Humboldt or Shelby?" Tr. 1290–91. Bambino acknowledged that Humboldt and Shelby were "not an efficient structure" for tax purposes, and that if one had formed them in the 2000s, one "would have formed these companies literally as partnerships, as limited liability companies, and you would not be paying corporate tax." [5] *Id.* at 1291.

At some point between May and December of 2000, while the Dillon family members were re-evaluating their use of Dunwalke Farm in order to reduce expenses and accommodate family interest in building homes on the land, they received an unsolicited offer for the property. The offer came from John Thornton, an executive of Goldman Sachs, who wanted to purchase the Princeton Property and all the surrounding farmland.[6] Collins testified that the Thorntons' interest "came really out of the blue" and that the Dillon family "had no idea that the Thorntons would be on our doorstep expressing an interest." Tr 148. Given the concerns that the family had about the costs of the cattle operation and the uncertain future of the Princeton Property, they decided to sell Dunwalke Farm to the Thorntons—but not all of the 900-plus

---

[5] The trial record is unclear whether Humboldt and Shelby were subject to personal holding company taxes during the 1990s. Ruddy's testimony suggests that the corporations only faced personal holding company treatment after their farmland was sold in 2002, whereas Collins's testimony suggests that they were personal holding companies even prior to the sale. *Compare* Tr. 173 *with* Tr. 514.

[6] The Thorntons were initially interested only in the Princeton Property. Their offer later was extended to include all of Dunwalke Farm.

acres.  Some members of the Dillon family—namely Dorothy Eweson and her descendants—wanted to keep a portion of the land for residences.

In early April 2001, Ruddy communicated to Bambino the decision the Dillon family had made.  Bambino's email to other Shearman & Sterling attorneys on April 5, 2001 stated:

> Jim called yesterday and told me that the Dillon family met on Wednesday and has decided to try to sell a substantial portion of the farmland to the Goldman Sachs executive and a smaller portion to D. Eweson. . . . I'll send you each a copy of the tax memorandum Jim asked me to prepare, which will include various approaches for disposing of Humboldt and its assets.

JX 19.  A draft of that memo, dated April 17, 2001, suggests that consideration of selling farmland had morphed into something more substantial:  "You have requested our advice with regards to the disposition of Humboldt Corporation ('Humboldt') and its assets.  This memorandum discusses alternative strategies for doing so and the US federal income tax consequences of each."  DX 3 at 000016.  As this summary suggests, the scope of the memorandum was not limited to the sale of Dunwalke Farm.  It also considered transactions that might follow the sale of the farmland, which would dispose of Humboldt altogether.  And, as will be discussed in more detail below, it is apparent as well that, beginning as early as mid-2001, James Ruddy was seeking ways to dispose of the corporations in a tax-efficient manner.

Specifically, the draft presented two principal strategies for disposing of Humboldt:  "Subsequent to the sale of the farmland, the shareholders may either liquidate the corporation by selling its portfolio and distributing the proceeds, or they may sell their shares in Humboldt to unrelated investors."[7]

---

[7] At trial, Bambino testified that this sentence may have been a "throw-away sentence I told the associate to put in there because we didn't know what they were going to do at the time."  Tr. 1323; 1419 ("I did not know at the time I wrote this that they were going to do either or none.").  While it may be true that the Dillon family had not committed to anything by April 2001, Bambino's testimony about his practices suggests that he would not have drafted a memorandum on a subject without having been asked to do so.  Moreover, Ruddy testified at trial that "[t]here is no reason to have a corporation if it doesn't have a purpose for it, and the purpose [of Humboldt] was the farm and the land and the cows."  Tr. 517.  A decision to sell Dunwalke Farm likely would have led to an interest in disposing of

*Id.*  The first was, in essence, an asset sale and the second a stock sale—tax consequences being the "biggest distinction" between the two.  *See* Tr. 1294 (Bambino).  As Bambino expected the Dillon family to be generally aware,[8] an asset sale triggered two levels of tax for built-in gains (at the corporate and the shareholder level), while a stock sale triggered only one level of tax for built-in gains (only at the shareholder level).  *See id.* at 1294; DX 4 (Draft of Bambino tax memo).  The reason why a stock sale did not trigger corporate-level taxes on built-in gains was because that liability would in essence be passed on to the buyer, although the purchase price might reflect a discount for that fact.  The buyer of a corporation would acquire its underlying assets with the built-in gains intact, so that gains were realized and taxes triggered when the buyer subsequently sold those assets.

Bambino understood that what the buyer did in a stock sale with the corporation's assets could become problematic.  The draft of the memo dated April 19, 2001, stated: "This [stock sale] poses a problem, however, if the investor then sells the Humboldt assets to a third party, because the transaction may be characterized as a tax shelter by the IRS."  DX 4 at 000021.  We are persuaded as well that his clients, specifically Chris Allen and James Ruddy, both "tax guys," along with Mark Collins, were equally aware of the potential problem.

Meanwhile, the sale to the Thorntons proceeded: Humboldt signed a contract on July 2, 2001, to sell 633 acres of Dunwalke Farm to the Thorntons for $19.4 million, with $2.0 million as a down payment and $17.4 million due in cash upon closing.  Closing of the sale was subject to municipal approval, which meant that it could take several months.  The contract also contained provisions in which the buyer proposed purchasing the Princeton Property from the Trustees of Princeton University, and the seller proposed selling the remaining 280-acre parcel to Dorothy Eweson.

On August 9, 2001, after a meeting that had taken place a week prior, Bambino sent Smith and Ruddy a follow-up memorandum about how Humboldt might be disposed of after the farmland was sold.  First, Bambino noted that Humboldt had signed a contract of sale to the Thorntons and that, if retained in the present form, Humboldt would be subject not only to federal

---

Humboldt.

[8] *See* Tr. 1295 ("I mean, Chris Allen was a tax guy, so they had a – Ruddy is a tax guy.  They have a general understanding that there's two levels of tax versus one level of tax.").

corporate income tax at a rate of 35%, but also a personal holding company tax of about 40% on its interest and dividend income unless Humboldt distributed that income annually to shareholders.   Afterwards, Bambino calculated the net proceeds of four hypothetical transactions—one involving a liquidating distribution after all assets were sold and three involving a stock sale of Humboldt.[9]

Bambino assumed that Humboldt stock would be sold at a price equal to 93% of the fair market value of the underlying assets, i.e., with very little discount for the embedded tax liability.   On that assumption, his calculations showed that the net proceeds to shareholders were greater by as much as $20 million in a stock sale as opposed to an asset sale.   But, as in the memo drafted in April, Bambino referred to IRS scrutiny about tax shelters: "As we discussed, there are certain tax risks that need to be explored and addressed when deciding to pursue [the options involving a stock sale of Humboldt]. *These include special IRS rules and penalties for certain intermediary tax shelter transactions*, failed installment sales and de facto liquidation treatment for Humboldt."   PX 73 at 001078 (emphasis added).

On December 7, 2001, about a month before the closing of the land sale, the contract was amended so that Humboldt would receive a promissory note (the "Thornton Note") instead of cash.   The amendment was, in short, a tax deferral strategy.   The farmland was paid for by an installment note, with capital gain realized and reported only when the principal was repaid.   And under the terms of the Thornton Note, Humboldt would not be paid the principal sum of $17,366,779 until January 2005.   The contract specifically forbade prepayment of the Thornton Note, so that taxes would not be triggered before 2005. *See* Tr. 1303 (Bambino) ("You would stay away from prepayments because prepayments would trigger gain to the person who's holding the installment note.   The whole purpose behind the installment note is to defer the tax.").   At the same time, the Thornton Note was backed by an irrevocable standby letter of credit issued by Citibank by which Citibank would be liable for payment of the note if the Thorntons failed to pay.

---

[9] Two of those strategies proposed amending the Thornton contract to restructure the transaction as an installment sale in which taxes were deferred until payments were made.   This was not the first time Bambino presented the idea of deferring taxes by selling Humboldt's farmland on an installment basis.   Bambino had previously sent a memorandum to Ruddy on June 29, 2001, about the strategy.

When Humboldt later sold the remaining 280 acres of Dunwalke Farm on August 9, 2002, the sale was once again structured as an installment sale. Dunwalke Farm Property, LLC—formed ahead of the sale by Trust 7373, a Dillon trust benefiting Dorothy Eweson and her descendants—purchased the land with a note (the "Dunwalke Note").[10]  Payment of the Dunwalke Note was due in August 2005, for the principal sum of $11,200,000.  And, like the Thornton Note, the Dunwalke Note was backed by an irrevocable letter of credit and could not be prepaid before its date of maturity.  As such, Humboldt deferred taxes on the gains associated with the 280 acres until August 2005.

### III.   The Decision to Sell Shelby Stock to the Same Buyer of Humboldt Stock

On January 11, 2002, as the sale of Dunwalke Farm was underway, Bambino sent a memorandum to Smith and Ruddy about alternative strategies for transferring the shares of Shelby, which Humboldt owned, before a potential stock sale of Humboldt.  As it stood, Humboldt owned 3500 shares of Shelby common stock, or 51.4% of Shelby.  Unless those shares were sold or distributed to Dillon trusts beforehand, a buyer of Humboldt would then own the majority of Shelby as well.  Before he explained the tax consequences of each strategy, however, Bambino summarized the applicable tax rules.  One of them referred to IRS scrutiny regarding intermediary tax shelters, as mentioned previously in the August memo: "The IRS has cautioned taxpayers against participating in certain conduit or intermediary tax shelter transactions where a party with losses acquired assets with built-in gain for resale.  See IRS Notice 2001-16."  JX 35 at 001427.

On February 15, 2002, Bambino sent a memorandum to Smith and Ruddy regarding a "new alternative we discussed last week."  JX 36 at 001431.  Because some of the Dillon family members wanted to keep Shelby's farms, *see* Tr. 518 (Ruddy), the alternative proposed that Shelby would first sell its farmland on an installment basis to Trust 8545.  Then, "if and when Humboldt is sold, the Dillon family trusts . . . would sell their Shelby stock to the unrelated investor that is also purchasing Humboldt."  JX 36 at 001431.  (In other words, the purchaser of Humboldt would also buy the 49% of Shelby stock not owned by Humboldt, so that the purchaser would own 100% of both Humboldt and Shelby.)  Smith presented this alternative

---

[10] Dunwalke Farm, LLC—a limited liability company formed by Trust 7373—first purchased the farm's personal property for cash on June 27, 2002.

as the "most cost effective" option in his March 2002 memorandum to the Dillon family and included calculations of sales proceeds which assumed that the buyer of Humboldt and Shelby stocks would offer a price equal to 95% of the fair market value of the corporations' assets. *See* JX 40 at 001442. He used that figure despite his understanding that there was an embedded tax liability of approximately $26 million.

The Dillon family did not choose this strategy right away. Bambino testified that he met with accounting firms at the request of the Dillon family in the spring of 2002 and that those firms suggested other strategies to dispose of Humboldt and Shelby, namely a "distressed debt transaction" and a "loan assumption transaction." *See* Tr. 1462; JX 56. Bambino was concerned about these alternatives and sent presentation slides to Smith and Ruddy that included IRS warnings about those specific strategies. *See* Tr. 1466 ("[T]he other goal was I didn't like the other two transactions, so I wanted to kill them."). At the same time, the presentation slides included an asset sale and a stock sale as a point of comparison. The asset sale was projected to yield $48 million of net after-tax-return to the shareholders, while a stock sale at "90% of FMV to NOL [net operating loss] Investor" was projected to yield $69 million of net after-tax-return to shareholders. *See* JX 56 at 001503.

When asked what he meant by an "NOL investor," Bambino answered, "[t]o me it meant someone who had tax attributes. I picked net operating losses because it's easy for people to understand, but it could be U.S. tax credits. It could be foreign tax credits. It's tax attributes that reduce tax on gain." Tr. 1464. The buyer's tax attributes were relevant to the stock sale because, in Bambino's words, the "shareholders [were] selling tax." *Id.* at 1465. In short, Bambino recognized that the value of Humboldt and Shelby would be different for a buyer with NOLs versus a buyer without NOLs. For the buyer with sufficient NOLs, Humboldt and Shelby's underlying assets effectively had no associated tax liabilities: losses would offset the gains, so that taxes would be reduced or even eliminated.

As for why Bambino assumed that the NOL investor would offer 90% or more of the market value of Humboldt and Shelby's assets, he testified that he relied on an "instinct formed by partner tax lunches, by going to a – I remember the Tax Club in New York." *Id.* at 1463. Bambino was "a little reluctant" to say that he had "never seen" such a figure before, but he nonetheless stated that "this transaction was a one-off transaction for me." *Id.* at 1463–64.

Ultimately, the Dillon family chose to sell Humboldt and Shelby through a stock sale after first becoming completely liquid. On September 19, 2002, Shelby sold its remaining farmland to Shelby Farms, LLC, which was formed ahead of the sale by Trust 8545. Shelby sold the farmland for a note with the principal sum of $5,017,205, due in September 2005 ("Shelby Note").

As a result, both Humboldt and Shelby were left with only cash and near-liquid assets, which included investment portfolios, notes from the sale of farmland (which were not to be prepaid), and shares of each other's stock. (Shelby owned 3,200 shares of Humboldt preferred stock.) At this point, Humboldt and Shelby's assets had a fair market value of around $93.7 million, with a cost basis of around $17.4 million. *See* JX 80; JX 119. The corporations' underlying assets therefore had unrealized gains of around $76.3 million.

Although a stock sale would not trigger the gains in the underlying assets, it was going to trigger gains in the *stock* of Humboldt and Shelby, for which the shareholders of Humboldt and Shelby would have to pay tax. In an email dated June 18, 2002, Ruddy wrote, "In early September we plan to sell Humboldt Corporation, holding common stocks, 3 installment notes and cash to a third party for cash at a discounted price. Each of the trusts receiving the sales proceeds will separately enter into a transaction in order to help offset the capital gain." DX 34 at 000118. When asked what he had meant by that separate transaction, Ruddy testified that the Dillon trusts receiving the stock sale proceeds were going to examine the portfolios of securities they owned and "sell securities that had losses in order to offset the gains from the sale." Tr. 584.

## IV.   Auction for the Sale of Humboldt and Shelby Stock

### a.   *Requesting Shearman & Sterling to Run a Limited Auction in Late 2002*

On September 26, 2002, Crosby Smith of Keswick emailed Bambino, asking for Shearman & Sterling's help in running an auction for the sale of Humboldt and Shelby stock. As Peter Rooney, the mergers and acquisitions partner at Shearman & Sterling overseeing the auction, testified, the stock sale of Humboldt and Shelby could not be publicly advertised because of securities regulations prohibiting a public offering of unregistered securities. The auction therefore had to be a limited one, with the offering memorandum sent only to select potential bidders. ("[S]o how do you make sure you're not engaging in a public offering by going around trying to sell stock to

people?  One thing you do is you only go to a limited number of people who are all sophisticated investors."  Tr. 1057.).

The Dillon family, however, decided not to hire an investment bank to run the auction, which would have entrusted the bank with the task of identifying bidders and soliciting their bids.  Collins testified that he trusted Shearman & Sterling to handle the auction because hiring an investment bank would have only added to the cost of what he believed was a "pretty straightforward" stock sale; he also expected "no great difficulty in . . . finding buyers for the stock" because "during this time, there were plenty of prospective buyers with NOLs [net operating losses]."  *See* Tr. 211.

The timing of the auction—before the end of 2002—was an important consideration for Collins.  Earlier, in April 2002, he had written in an email to his sister that "it is important to keep this moving forward as there is a second, timing related rather complex tax oriented transaction that needs to be completed this year . . . . This transaction will save considerable $ for family trusts that own Humboldt."  JX 45 at 001454.  When asked at trial what he had meant in this email, Collins explained that one of the things he had in mind were market conditions "after the dot-com bubble burst"— specifically, his belief was that there were "very large companies that had net operating losses and that could ultimately be purchasers of [Humboldt and Shelby]."  Tr. 169.  Collins saw such a moment in the market, when many companies had losses, as an "opportune time" for the stock sale of Humboldt and Shelby.  *Id.*  In short, he believed that companies with NOLs were the "logical buyers" of Humboldt and Shelby.  *Id.*

Peter Rooney likewise recalled that there "were a lot of economic problems" in 2002 because of the "dot-com bust" and the "stock market [going] down enormously."  Tr. 1062.  Ironically, however, Rooney further recalled that such events led to a poor liquidity market in 2002—in other words, "all the investors pull back and they don't want to buy anything, so you can't sell anything because they don't want to buy anything.  That's an illiquidity."  *Id.* at 1063.  Consistent with Rooney's testimony about poor liquidity, Collins did not expect buyers with NOLs to offer 100% of the net value of Humboldt and Shelby's underlying assets: "[W]ell, that would be nice if we could have received 100 percent, but you know . . . those bidders coming in are entities that I presume to have losses, and it's advantageous for them to acquire these assets at a discount . . . ."  Tr. 215.

*b.  Identifying Potential Bidders*

By October 21, 2002, the list of potential bidders included five entities: Merrill Lynch, Deutsche Bank, CitiSSB ("CitiBank"), K&Z Partners LLC ("K&Z"), and TranStar Capital Corporation ("TranStar"). *See* JX 88. Of that list, Bambino had identified the first three—they were "folks [he] had worked with before, planning transactions, at these various large banks." Tr. 1457–58. In his own words, Bambino "did not actively go out and seek bidders."[11] Tr. 1457.

The final two entities, K&Z and TranStar, were firms that Ruddy had identified in his October 8 email. *See* JX 83 ("Here are the firms that I have had discussions with for over a year."). When asked what those discussions had been about, Ruddy replied that the only conversations that he could remember with those firms had to do with hedging the investment portfolios owned by Humboldt and Shelby, and not a stock sale. *See* Tr. 604. Collins had introduced Ruddy to Richard Zack, the managing partner of K&Z, to explore the possibilities of hedging; Collins had learned about Zack through his work at Brown Advisory. *See* Tr. 266–67. Ruddy had been in discussions as early as mid-2001 with potential buyers of Humboldt corporation. In an email to Bill Jones of Keswick, he wrote that he was about to meet with Richard Zack on August 13, 2001, to discuss "hedging the portfolio." Dx 40. "Zack . . . is the first person I discussed selling Humboldt with a year ago." *Id.*

Bambino's email on October 21, however, left room for that list to grow. He wrote, "Chris Allen called me last week and said that he and BDO [Seidman] have identified 2 other potential bidders. I suggested that Chris send you and I their names by email and that we would discuss whether we should contact them." JX 88. Around the time of the transaction, however, BDO was receiving adverse publicity over its involvement in tax shelter transactions. Mr. Bambino testified that, as a matter of caution, he ran a Lexis search which revealed that BDO was under investigation by the IRS for involvement in tax shelter promotions involving intermediate or "midco" entities as a way of avoiding tax, information he passed along to his clients.

The next day, Bambino faxed Crosby Smith four different newspaper articles related to a federal district court order that required the accounting

---

[11] In fact, Bambino testified that Deutsche Bank expressed an interest before he was even aware that an auction was going to take place. *Id.* at 1455–56. ("Greg Grauer . . . called me in the summer and announced that he was interested and surprised me, . . . I hadn't been part of a conversation that said the company was going to be sold, but he was interested in bidding on the company . . . .").

firm, BDO Seidman, to disclose tax shelter-related documents to the IRS. *See* JX 89. Of the four articles attached, one appeared in the Wall Street Journal, which reported: "The IRS identifies at least seven BDO transactions, touted as 'Capital Gains Eliminators,' as 'potentially abusive' because they resemble so-called basis-shifting shelters that the IRS added to its list of suspect transactions in 2001. Such strategies artificially inflate taxpayers' reported losses so they can be used to offset gains." *Id.* at 001896.

Within a week of receiving Bambino's fax, Smith sent a memorandum to the Dillon family enclosing a copy of the confidential offering memorandum that was being given to potential bidders. JX 92. Smith did not name any potential bidders nor refer to BDO Seidman; he wrote, "I should say also that we are trying to be careful about whom we invite to bid as we do not want to include any entity which has a reputation for aggressive tax shelter promotion." *Id.*

On November 1, 2002, Bambino emailed Smith and Ruddy, informing them that he "spoke with Chris Allen and he agreed Humboldt should not pursue potential bidders through BDO." JX 95. Bambino testified that he "eliminated BDO" because "[b]ased on those articles, that was not somebody we should work with." Tr. 1452. And without further involvement by BDO, the list of potential bidders was in effect capped at five.

Critically, at no point was there any effort to target companies based on their holding of NOL's or any other tax attributes that might justify the assumption of liabilities. There is no suggestion in the testimony or paper record that plaintiffs or their representatives made any search for such entities, nor was there any effort to determine whether the bidders which did show up were in a position to absorb capital gains.

c. *Receiving Bids and Selecting the Winning Bid*

Of the five potential bidders that were identified, three submitted offers in writing. The first offer was submitted on November 11, 2002, by K&Z. The actual bidder, however, was not K&Z but an entity called Diversified Group Incorporated ("DGI"): Richard Zack wrote a cover letter introducing DGI and attached a bid letter signed by James Haber, the President of DGI. *See* JX 97. According to that letter, DGI's offering price was 95% of the net asset value of Humboldt and Shelby. *See id.* at 001951.

For his part, Bambino was "surprised" when he received news of DGI's bid because he had expected the bid to come from K&Z. *See* Tr.

1453. That day, Bambino told Greg Schultz, a legal assistant at Shearman & Sterling, to run a search for DGI. According to billing records kept at Shearman & Sterling, Schultz billed 0.6 hours on November 11 for the entry, "Research Diversified Group tax controversy disclosure per L. Bambino." JX 194 at 003834. Despite asking for the research, Bambino testified that he does not recall what the reference to "tax controversy disclosure" in that entry meant. Tr. 1450.

Although Bambino reviewed Schultz's work as a matter of practice, Schultz's 36 minute search on November 11 did not turn up anything on DGI as far as Bambino was aware. Bambino, for instance, did not become aware of the reported opinion by the Southern District of New York that identified DGI as being "engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes." *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 448 (S.D.N.Y. 2001).[12]

After DGI submitted its bid, Deutsche Bank submitted the second bid, offering around 86% of the net asset value of Humboldt and Shelby. *See* JX 103; Tr. 1737 (Malinak). TranStar then submitted the third and final bid, offering a price around 95% of the net asset value of Humboldt and Shelby. *See* JX 105. CitiBank did not submit a bid, even though Bambino had previously communicated CitiBank's proposal to Smith and Ruddy. *See* JX 84. CitiBank wanted to exchange CitiBank preferred stock for the stock of Humboldt and Shelby; such a transaction was advantageous for the Dillon family because it counted as a "tax-free reorganization" where shareholders would not pay any tax at the time of the transaction. *See* Tr. 1359 (Bambino). Bambino explained that in 2002, taxes could be deferred until the maturity of the preferred stock, which might be 20 or 30 years later; in the meanwhile, the preferred stock could be pledged at a bank for less than its face amount. *See id.* at 1360. Ruddy testified, however, that the Dillon family did not want to pursue the CitiBank option because "[t]hey didn't want that stock": "They wanted to basically have cash so they could invest it across the board in the various trusts." Tr. 602.

Of the three bids received, the Dillon family decided to invite only DGI and TranStar to offer their best and final bids, while requiring that the proposal be for payment in cash, with sources of financing to be identified. *See* JX 107; JX 108. When Gregg Grauer from Deutsche Bank heard from

---

[12] Nor did he run across the unpublished opinion in *United States v. Diversified Grp., Inc.*, No. M-18-304, 2002 WL 31947904 (S.D.N.Y. November 25, 2002).

Shearman & Sterling that Deutsche Bank was being excluded from the final round of bids, he sent the following email to Bambino on November 21: "Your M&A folks advise that the sellers are going to go with the 'highest bidder' . . . . We believe that this approach is a bit simplistic and that it ignores the benefits that other sellers in the past have ascribed to Deutsche Bank's role as a buyer purchasing with its own cash as compared against a boutique buyer using thinly capitalized [special purchase vehicles] funded with principally borrowed cash to execute."  DX 62.

Bambino does not believe he passed Grauer's assessment on to his clients.  Nor did he conduct any further investigation into DGI based on Grauer's claims:

> Q. Okay.  Do you know whether they were thinly capitalized?
> A. I did not know that.
> Q. Okay.  Did you do any investigation as to whether they were thinly capitalized?
> A. I did not do that.
> Q. Did you do any investigation as to whether they had to principally borrow the cash to execute?
> A. I did not do that.
> Q. Do you know if anyone did?
> A. I don't know that.

Tr. 1474.

DGI was not an entity that the Dillon family, nor anyone at Keswick had heard of prior to receiving the bid.  Despite not having any information about DGI, neither Keswick nor the Dillon family conducted any research themselves.  Ruddy testified that he, in fact, saw no need to ask questions himself: "[Shearman & Sterling] were handling the transaction.  I had no reason to go ahead and ask anything." Tr. 615.  Like Ruddy, Collins testified that he expected Shearman & Sterling to pursue any necessary research about bidders.  Tr. 421–22.

Bambino was asked at trial, "Q. Would I be correct that you were not asked by the Dillon family or Keswick to research DGI?"  Tr. 1447–48.  To which he replied, "A. You would be correct."  Tr. 1448.  When the final bids were received, Collins did not know anything about DGI's bid other than the fact that it was the "highest bid."  Tr. 422.

When asked why he did not enquire further of DGI as to it's plans for Humboldt and Shelby or regarding financing, Bambino responded, "We were

told, as I recall, that they had proprietary plans, which isn't unusual, because lots of people have proprietary transactions." Tr. 1453. When asked, "Did that raise any red flags for you?" he answered, "No, because people were planning to – the transactions were proprietary." *Id.*

In short, neither the Dillons, their advisors, or Bambino did any investigation into the bona fides of DGI or Haber, despite Grauer's comments and despite their knowledge of the IRS's concern about tax avoidance scheme promoters.

At the same time, Bambino told Crosby Smith that he would not be able to provide a tax opinion with respect to any transaction other than the CitiBank transaction because he did not know those other bidders: "I said we knew Citi, so we could give an opinion with respect to the CitiBank transaction. The other potential transactions they were looking at, I – we didn't know the facts, so we weren't going to be in a position to give an opinion." Tr. 1403. He in fact had recommended the CitiBank stock swap because, in addition to its tax advantages, he did not know enough about the other bidders and their bids. CitiBank, on the other hand, had been represented by Shearman & Sterling for 140 years.

On November 26, 2002, Peter Rooney and David Kershaw, an associate at Shearman & Sterling working on the stock sale, sent Keswick a memorandum summarizing DGI's and TranStar's final bids. DGI offered $92.2 million in cash while assuming the underlying assets' value to be $97.0 million—i.e., 95% of total value. It disclosed Rabobank as the funding source. TranStar, on the other hand, offered $86.6 million in cash while assuming the underlying assets' value to be $91.1 million—or 95.14% of total value. The summary did not contain information about the bidders other than the price they were offering and what the net proceeds to each shareholder would be.

The higher price was the sole basis on which DGI was selected as the winning bid. When asked why DGI was selected over TranStar, Ruddy replied, "It was the highest bid." Tr. 612.

### d. HSHC as the Purchaser of Humboldt and Shelby and the Borrower from Rabobank

On November 27, 2002, Kershaw emailed clean and blackline versions of the Stock Purchase Agreement ("SPA") to individuals at DGI and Proskauer Rose ("Proskauer"), the law firm representing DGI. *See* JX 118. That same day, HSHC also filed a certificate of incorporation with the

Secretary of State of the State of Delaware, listing James Haber as the sole shareholder and president.  Stip. ¶ 55.  Within a week, Lana Yang, an associate at Proskauer Rose, informed Shearman & Sterling and Keswick that the purchaser of Humboldt and Shelby would be HSHC, not Haber or DGI.  *See* JX 121.

HSHC worked out the terms of its loans with Rabobank, which was the source of financing that DGI had identified in its final bid letter.  *See* JX 113.  On December 3, 2002, Rabobank emailed DGI and Proskauer (but not Shearman & Sterling or Keswick) initial drafts of documents related to HSHC's financing.  *See* JX 122.  Included in the email was a draft of the Promissory Note, which listed "conditions precedent" that had to be met for Utrecht-America Finance Company ("UAFC"), a wholly-owned subsidiary of Rabobank, to advance $95 million to HSHC.  The draft stated that UAFC would not make the advance until HSHC and UBS PaineWebber had "executed and delivered a purchase agreement," pursuant to which UBS PaineWebber would purchase the investment portfolios that Humboldt and Shelby owned.  *See id.* at 002459–60.  And while the Promissory Note did not list the execution of the Note Purchase Agreement as a condition precedent, the email also included a draft of the agreement which contemplated that Humboldt and Shelby will "sell, assign and transfer" to Rabobank the Dunwalke Note, the Thornton Note, and the Shelby Note.  *See id.* at 002468.

That same day, Haber emailed Kershaw and Yang with the subject line "Humboldt and Shelby notes": "Shortly after the closing, Humboldt and Shelby will be selling the notes to Rabobank.  In connection with that sale, we will need to arrange for Rabobank to become a beneficiary under the Chase and Citibank letters of credit."  JX 123.  It was also on the same day that the directors of Humboldt and Shelby agreed to "establish one or more accounts at UBS PaineWebber Incorporated for the purpose of holding certain of the Corporation's cash and securities."  JX 1.24 at 000373.

From November 27, 2002, to December 23, 2002, Shearman & Sterling and Proskauer exchanged clean and blackline versions of the SPA and negotiated terms.  On November 27, 2002, plaintiffs proposed adding the following clauses:

- Section 6.04(c): "The Purchaser and each Company shall file, or be included in, a consolidated federal income tax return immediately after the Closing Date and the Purchaser and the Sellers agree that for federal income tax

purposes, the tax year of each Company shall end on the Closing Date pursuant to applicable Treasury regulations."

- Section 7.04, 7.05: Exceptions added for "any fraudulent misrepresentation or intentional breaches of the covenants or agreements set forth in this Agreement"

JX 118 at 002332, 002336–37.

In earlier draft Escrow Agreements, the Bank of New York was listed as the escrow agent with respect to funds held to ensure environmental remediation. Sometime after December 2, Bank of New York was replaced by State Street Bank.

On December 4, 2002, James Ruddy emailed Terri Holbrook, an acquaintance at an investment firm, explaining the decision that was made regarding Humboldt and Shelby:

We offered to sell the stock of both Humboldt and Shelby Corporations to 5 bidders out of a group of 8 potential purchasers. We ended up with 2 very high and substantially identical bids. They were each given 48 hours to change their bids and agree to certain timing issues and an escrow agreement. . . . A sale of the stock for all cash of around $90 million was very attractive. The risk of the war in Iraq was a catalyst in trying to close the deal as soon as possible. We have an agreement in principle and will try to accomplish this ASAP.

JX 126.

On December 5, 2002, Humboldt and Shelby transferred their portfolio of securities to the account established at UBS PaineWebber. Stip. ¶¶ 58–59. Mr. Bambino's timesheet for the day includes: "Review Notes, Sales Contract regarding Tax Issues; Meeting with Mr. Kershaw regarding same; Legal research of Consolidated Return Rules regarding Tax-Year Closing." JX 194 at 003843.

On December 9, 2002, Lana Yang from Proskauer sent David Kershaw a fax with a marked-up copy of the SPA. Yang changed "each Company will retain a substantial portion of its assets" to "each Company will retain substantial assets." JX 130 at 002670.

21

On December 11, 2002, David Kershaw emailed Proskauer and DGI under the subject line, "Revised Agreements." The email attached clean and blackline versions of the SPA, as well as clean and blackline versions of the Humboldt Escrow Agreement. Plaintiffs accepted Yang's revision from retaining a "substantial portion" of assets to "substantial assets." Plaintiffs also added the underlined language: "Humboldt will retain ownership of the Humboldt Notes for a period of at least one year from their respective issue dates and Shelby will retain ownership of the Shelby Note for a period of at least one year from its issue date." JX 133 at 002798. And, "The Purchaser shall be responsible for . . . Taxes attributable to the sale, exchange or disposition of the Notes after Closing." *Id.* at 002800.

On December 12, 2002, Yang emailed Kershaw and Rooney at Sherman and Sterling with the subject line, "Amended and restated notes." She wrote: "Per Rabobank's request, please forward the drafts of the proposed amended and restated notes for Thornton, Dunwalke and Shelby as soon as possible." DX 82. Later that day, David Kershaw sent Proskauer and DGI draft amendments to the three notes, leaving a blank for an additional eligible assignee. DX 84. Haber replied to Kershaw's email the next morning with the instruction that the name to put in the Eligible Assignee blank was Rabobank International. DX 86.

On December 16, 2002, Lana Yang faxed David Kershaw a copy of the marked-up SPA. Next to plaintiffs' latest addition of retaining ownership of Humboldt notes for a period of at least one year from their issuance dates, Yang wrote: "No—deal is Humboldt will retain Thornton Note until Jan 1, '03 and Dunwalke until July 1, '03 and Shelby will retain its note until July 1, '03." JX 139 at 002934. Yang also struck out plaintiffs' addition of "The Purchaser shall be responsible for . . . Taxes attributable to the sale, exchange or disposition of the Notes after closing." *Id.* at 002935.

On December 18, 2002, David Kershaw emailed Proskauer and DGI with the subject line, "Disclosure Schedules." The email attached clean and blackline versions of the SPA. Plaintiffs adopted the dates that Yang provided in JX 139 regarding retention of the three installment notes under section 5.02: "[T]he Purchaser shall cause (i) Humboldt to retain ownership for U.S. federal income tax purposes of the Thornton Note until after January 1, 2003 and of the Dunwalke Note until after July 1, 2003 and (ii) Shelby to retain ownership for U.S. federal income tax purpose of the Shelby Note until after July 1, 2003." JX 142 at 003120. Plaintiffs added the following underlined language under section 6.01: "The Purchaser shall be responsible for, and indemnify the Sellers against . . . Taxes of the Companies (for any Tax Period before or after Closing) attributable to the breach of any covenant

set forth in Section 5.02 (including, without limitation, the sale, exchange or other disposition of the Notes after Closing (including a pledge treated as such for U.S. federal income tax purposes.))."  *Id.* at 003123.

The stock sale closed on December 23, 2002. As part of the closing, HSHC's account at Rabobank reflected a wire transfer of $86.33 million, representing the payment for Humboldt and Shelby stock. Stip. ¶ 66. In order to finance the purchase, Haber, as president of HSHC, signed a promissory note to Rabobank, agreeing to repay the principal amount of a loan up to $95 million, with interest ("HSHC Loan"). Stip. ¶ 62; JX 2.27. He also pledged the stock in Humboldt and Shelby. JX 2.30. Separately, Haber, as president of Humboldt, signed an additional promissory note to Rabobank, agreeing to repay the principal amount of $28.7 million, with interest ("Humboldt Loan"). Stip. ¶ 63; JX 2.36. He pledged the Thornton Note and the Dunwalke Note as collateral. JX 2.30. In addition, as president of Shelby, Haber signed a third promissory note to Rabobank, agreeing to repay the principal amount of $5.1 million, with interest ("Shelby Loan"). Stip. ¶ 64; JX 2.40. He pledged the Shelby Note as collateral. JX 2.30. HSHC's account at Rabobank was then credited with $90 million, $28.6 million, and $5 million. Stip. ¶ 65.

To fund the repayment of the initial loan, on December 23, 2002, HSHC sold the portfolio of stocks held by Humboldt and Shelby to UBS PaineWebber for about $50.5 million. On December 24, 2002, Shelby transferred $6 million from its UBS PaineWebber account to HSHC's Rabobank account. On December 27, 2002, the proceeds from the sale of Humboldt and Shelby's portfolio of securities were credited to Humboldt and Shelby's UBS PaineWebber accounts. On December 24, HSHC repaid the $90 million loan to Rabobank.

Although the plaintiffs refused to allow prepayment of the Shelby and Dunwalke installment notes, Stip. ¶¶ 75–76; JX 184, they were aware that the SPA allowed HSHC to pay the two notes early, on or after July 1, 2003, *see* JX 184 (Barclay email to John Haber of May 1, 2002). In fact, on July 21, 2003, Shelby Farms LLC was notified that the Shelby Note payable to Shelby, due September 19, 2005, was assigned to UAFC. Stip. ¶ 77. On July 29, 2003, Dunwalke Farm Property LLC was notified that the Dunwalke Note payable to Humboldt, due August 9, 2005, was assigned to UAFC. Stip. ¶ 78.

The parties do not dispute that, between December 24, 2002, and May 5, 2003, James Haber caused Humboldt and Shelby to engage in abusive "Son-of-BOSS transactions" designed to generate fictitious losses of $74.1

million.  Stip. ¶ 79.  Defendant does not contend that plaintiffs were involved in those transactions.

On August 14, 2004, HSHC filed a consolidated income tax return for the tax year beginning December 23, 2002, and ending November 30, 2003.  The return reported a capital gain of $42.86 million from the sale of Humboldt and Shelby's investment portfolios.  It also reported capital gains of $15.36 million, $3.96 million, and $11.0 million from the sales of the Thornton, Shelby, and Dunwalke Notes.  The total gains were $73.2 million.  It simultaneously reported $74.1 million in losses, which theoretically offset any liability for the gains.

On August 14, 2007, the IRS issued a statutory notice of deficiency to HSHC.  The IRS determined that the losses claimed were artificial and that HSHC owed $25.6 million in income tax and $10.2 million in gross valuation misstatement penalty, along with underpayment interest.  The U.S. Tax Court upheld the Commissioner's decision and the Second Circuit affirmed, as noted earlier.

On October 25, 2016, the IRS issued notices of transferee liability to the Dillon trusts that were parties to the Stock Sale.[13]  The Dillon trusts paid the assessed transferee liabilities in full, around $79.9 million, in October 2017.  In December 2017, the Dillon trusts filed suit in this court, seeking a refund of all taxes, penalties, and interest paid as transferees of HSHC.

### DISCUSSION

Under I.R.C. § 6901, the IRS may collect any deficiency or underpayment of income tax from a party other than the originally liable taxpayer if they are "transferees" of the taxpayer's property, who have a "liability, at law or in equity."  Section 6901(a) provides that "[t]he liability, at law or in equity, of a transferee of property [of a taxpayer]" shall be "assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the cases of the taxes with respect to which the liabilities were incurred."  The provision, however, merely establishes a

---

[13] The IRS issued notices of transferee liabilities to the nine Dillon trusts that had received the payment of $86.8 million from HSHC.  But in the case of six of those trusts, successor trusts had to make payments to the IRS because the original trusts no longer existed.  According to the letter that the Dillon Trust Company sent the IRS, six of the nine Dillon trusts that were parties to the Stock Sale terminated between 2007 and 2012 and distributed their assets to multiple successor trusts.  Stip. ¶ 93.

procedure by which the federal government may collect taxes from transferees and does not by itself create nor does it define the substantive liability of transferees, which is determined pursuant to state law, in this case, that of New York. *Comm'r v. Stern*, 357 U.S. 39, 42 (1958) (analyzing I.R.C. § 311, the predecessor to § 6901 with nearly identical language). The Eighth Circuit has reasoned that, because state law governs § 6901 under *Stern*, "the Commissioner may proceed under § 6901 against any 'transferee' who is liable under state law for the debts of the transferor/taxpayer." *Stanko v. Comm'r*, 209 F.3d 1082, 1085 n.2 (8th Cir. 2000). To the same effect is *First National Bank of Chicago v. Commissioner*, where the Seventh Circuit held that a "transferee" under § 6901 includes "one who takes the property of another without full, fair and adequate consideration to the prejudice of creditors." 255 F.2d 759, 762 (7th Cir. 1958).

In the absence of a Federal Circuit precedent, we find the Seventh and Eighth Circuits' approach to be persuasive and apply it here. The IRS can proceed under § 6901 against transferees as understood in that provision, which involves a two-part test. First, the putative transferees (the Dillons in this case) must meet the definition of a "transferee" under federal law. Beginning with the I.R.C., § 6901(h) defines "transferee" to include a "donee, heir, legatee, devisee, and distributee . . . ." Treasury regulations supplement this definition by further providing that the term "transferee" includes "the shareholder of a dissolved corporation, . . . the successor of a corporation, . . . and all other classes of distributees." 26 C.F.R. § 301.6901-1(b). These definitions are both broad and nonexclusive, thus a party may be a "transferee" under § 6901 even if it does not fall squarely into an enumerated category. *See Alterman v. Comm'r*, 110 T.C.M. (CCH) 507, *45 (2015). We have no difficulty finding that plaintiffs are transferees under § 6901 by virtue of their receipt of the proceeds of the Stock Sale.

The second step in the analysis is whether the Dillons are liable under the applicable state law, which in this case, is the Uniform Fraudulent Conveyance Act of the New York Debtor and Creditor Law ("NYUFCA"), codified at N.Y. Debt. & Cred. §§ 270–81 (McKinney 2000), as it existed in 2000 and our references will be to that version.[14] Sections 273 and 276 provide a means for finding a transaction fraudulent.

The provision on which the government places primary reliance is § 273, which recognizes that a conveyance may be constructively fraudulent, such as when a conveyance is made without fair consideration and results in

---

[14] The statute was extensively rewritten in 2020, although in ways which would not affect our substantive analysis.

the insolvency of the party that made the conveyance.  That section provides as follows:

> *§ 273. Conveyances by insolvent.*
>
> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Insolvency is defined in § 271 as when the present value of assets "is less than the amount that will be required to pay [the transferor's] probably liability on his existing debts as they become absolute and matured."

Fair consideration is defined in the following section:

> *§ 272. Fair consideration.*
>
> Fair consideration is given for property, or obligation,
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Fair consideration thus includes an equivalent exchange *and* good faith.  As the government points out, the absence of either an equivalent exchange or good faith on the part of either party to the transaction precludes fair consideration.  Actual intent to commit fraud is not required under § 272 or § 273, and, as we explain below, constructive fraud on the part of either transferee or transferor is sufficient to vitiate good faith.

Section 276 on the other hand requires proof of actual intent to commit fraud.  In this case, the government's only assertions of actual intent are directed at the actions of Haber, not plaintiffs.  Under § 276, however, Haber's fraud, which plaintiffs do not question, is sufficient to entitle the government to relief under the statute.

If fraud is proved pursuant to either § 273 or § 276, the government's remedy is set out in § 278:

*§ 278 Rights of creditors whose claims have matured*

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
b. Disregard the conveyance and attach or levy execution upon the property conveyed.

As can be seen, paragraph 1. provides a comprehensive good faith defense to the transferee, assuming it can show both fair consideration and lack of knowledge. In addition, paragraph 2 offers a partial defense in the form of a cap on liability:

2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

Apparently it is for this reason that the government does not rely on actual fraud under § 276 to establish liability. Although it seems clear that the Tax Court's findings about Haber's actions would seem to satisfy that test, presumably the government focuses on § 273 because plaintiffs might have an affirmative defense under § 276 if they acted in good faith.

Read together, these provisions, insofar as relevant here, mean that, if the result of the Stock Sale by itself, or the Stock Sale and subsequent asset sales, was that HSHC was left insolvent and thus unable to pay its tax liabilities, or, if the consideration received by HSHC was not a fair equivalent for what the plaintiffs received, and if the Dillons were not acting in good faith, i.e., had constructive knowledge of HSHC's plans, the IRS becomes a creditor of the plaintiffs. Or in the words of the statute, plaintiffs become liable as transferees. As we will see below, the initial question of insolvency will turn on whether the asset sale and Stock Sale can be viewed as part of a single transaction.

The parties disagree about which of them has the burden of proving or disproving constructive fraud. The government argues that plaintiffs bear the burden of disproving fraud because, as a general rule, taxpayers bear the

burden of proof in a refund suit.[15]  *See Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998) ("[T]he taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination.").  Neither this court nor the Federal Circuit has previously decided the issue in the context of a fraudulent conveyance.  *See, e.g.*, *Drew v. United States,* 177 Ct. Cl. 458, 463 (1966) ("In my view of this case, it is unnecessary to decide the burden of proof issue, since the evidence fully warrants the conclusion that the taxpayers are liable as transferees for the corporation's unpaid taxes.").

As plaintiffs point out, however, state law determines the burden of proof when federal courts apply state law to the merits of an action.  *See Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959).  Although plaintiffs may be seeking a refund, their entitlement depends on whether the government is successful in establishing, under New York law, that they were transferees, which in turn depends on whether or not there was some species of fraud.  The fact that the pending action is in the posture of a refund suit thus does not change the analytical framework of I.R.C. § 6901 and its reliance on state law to determine substantive liability.

New York law plainly holds that the party seeking to set aside a conveyance under the NYUFCA bears the burden to show that it was actually or constructively fraudulent.[16]  *Kreisler Borg Florman Gen. Constr. Co., Inc. v. Tower 56, LLC*, 872 N.Y.S.2d 469, 471 (N.Y. App. Div. 2009) ("The burden of proof to establish actual fraud under Debtor and Creditor Law § 276 is upon the creditor who seeks to have the conveyance set aside."); *In re Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 595 N.Y.S.2d 537, 538 (N.Y. App. Div. 1993) ("The burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance.").  This judicial precedent has since been codified in the 2020 version of the NYUFCA.  N.Y. Debt. & Cred. § 273(c) (McKinney 2020) ("A creditor making a claim for relief under subdivision (a) of this section has the burden of proving the elements of the claim for relief by a preponderance of the

---

[15] Although I.R.C. § 6902(a) places the burden on the government to show transferee liability under § 6901, it refers specifically to "proceedings before the Tax Court."  It thus does not provide for the burden of proof in this court.

[16] The standard for such proof is clear and convincing evidence. *See In re U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, 950 N.Y.S.2d 767, 770 (N.Y. App. Div. 2012); *Farkas v. D'Oca*, 761 N.Y.S.2d 15, 15 (N.Y. App. Div. 2003).  The standard appears to have changed in the recent codification to one of preponderance.

evidence.")  Accordingly, the government here bears the burden to show a fraudulent conveyance that may be set aside to satisfy the IRS's claim.

A distinction may be drawn, however, when it comes to a possible defense under § 278.  There, it would appear, at least in the abstract, that plaintiffs have the burden of proof with respect either to a comprehensive defense based on giving fair consideration and not otherwise being involved in fraud, or, under paragraph 2, establishing a partial cap on liability.  Given the fact that the government is proceeding under § 273, it becomes a moot point, as we will see, because the government has proved by clear and convincing evidence that the Stock Sale and asset sales should be viewed as a single transaction based on plaintiffs' constructive fraud.

## I.      Transferee Liability Analysis under NYUFCA

Section 273 begins with the assumption that there has been a "conveyance."  When a creditor attempts to demonstrate that a transfer was fraudulent because the putative transferees did not give fair consideration, the question arises as to whether that single transaction between the buyer and seller is sufficient to establish a conveyance within the contemplation of the statute.

"Midco" transactions are designed to take advantage of this problem by inserting an entity in between the sellers of the target corporation which owns the assets and the ultimate purchasers of the assets.  Here, for example, there was not a direct conveyance between the Dillons on the one hand and, on the other hand, Rabobank or UBS PaineWebber, the entities which ended up with the stock portfolios and notes.  Rather, the Dillons sold Humboldt and Shelby to HSHC, and then Humboldt and Shelby in turn sold the assets to others.  From plaintiffs' perspective, the one single conveyance between them and HSHC is insufficient to demonstrate fraud.

The government offers a couple of alternate theories to get around this problem.[17]  The first we reject.  It argues that because, under federal tax law,

---

[17] It argues that, because HSHC and Humboldt and Shelby corporations were a consolidated group for tax filing purposes, and because the IRS was a contingent creditor of Humboldt and Shelby and HSHC at the time of the stock sale, then the IRS can recover from plaintiffs if it can show that the Stock Sale left HSHC without sufficient assets to pay the IRS as creditor.  Because the subsequent asset sale triggered an unpayable tax liability, and that inability then could be attributed back to HSHC as part of the consolidated group, *ipso facto*, the IRS can collect from the other party to the

HSHC and Humboldt and Shelby were all part of the same consolidated tax group for the tax year beginning on December 23, 2002, HSHC is severally liable along with Humboldt and Shelby for those corporations' capital gains tax liabilities.  The theory is that because the government was a creditor of Humboldt and Shelby it was also a creditor of HSHC, the Dillon's opposite party in the Stock Sale.  What the government ignores, however, as plaintiffs point out, is that the Humboldt and Shelby were not part of the HSHC tax group at the moment of the Stock Sale and the monies used to make the payment were present before the acquisition.  In addition, the government is using procedural concepts drawn from federal tax law to make a substantive point under state fraud law.  We believe that violates the fundamental separation between liability under the NYUFCA and I.R.C. § 6901.

Fortunately for the government, however, it is also able to rely on a well-trod theory in which plaintiffs are liable as transferees if there are grounds to collapse the Stock Sale and the subsequent asset sales into a single transaction.  Then, when we ask the question whether, under § 273, the conveyance was made without fair consideration because it rendered HSHC insolvent, the conveyance in question includes both the Stock Sale and Humboldt and Shelby's subsequent asset sales.

The most useful case for analyzing our facts is *Diebold Foundation, Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013).  As here, the plaintiff shareholders in *Diebold* owned stock in a corporation which in turn held appreciated assets.  Because the court in *Diebold* so elegantly and economically sets out the dynamics which follow from those basic circumstances, we quote the opinion at length.

> When shareholders who own stock in a C Corp that in turn holds appreciated property wish to dispose of the C Corp, they can do so through one of two transactions: an asset sale or a stock sale.  In an asset sale, the shareholders cause the C Corp to sell the appreciated property (triggering the built-in gain tax), and then distribute the remaining proceeds to the shareholders.  In a stock sale, the shareholders sell the C Corp stock to a third party.  The C Corp continues to own the appreciated assets and the built-in gain tax is not triggered.  In other words, in an asset sale, because C Corps are treated as separate legal entities for tax purposes, subject to corporate tax (independent of any capital gain taxes assessed against the earning shareholders), a C Corp's sale of its assets imposes an

---

Stock Sale, the plaintiffs.

additional tax liability. While the C Corp, and not the shareholders, pays this tax liability, such payment nonetheless reduces the amount of cash available for distribution to those shareholders.

In the case of a stock sale, the assets remain owned by the C Corp and the tax on the built-in gain is not triggered. Buyers would generally prefer to purchase the assets directly and receive a new basis equal to the purchase price, thus eliminating the built-in gain. Sellers generally disfavor the sale of assets because of the attendant tax liability and would prefer to sell the stock and move the tax liability on to the purchaser. However, the seller's preferred transaction merely pushes the tax liability down the line; at any point when the shareholders of the C Corp—including new owners who purchased the shares in a stock sale—wish to sell the assets, the built-in gain tax will be triggered. Because of this accompanying tax liability, a stock sale will generally merit a lower sale price than an asset sale.

"Midco transactions" or "intermediary transactions" are structured to allow the parties to have it both ways: letting the seller engage in a stock sale and the buyer engage in an asset purchase. In such a transaction, the selling shareholders sell their C Corp stock to an intermediary entity (or "Midco") at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The Midco then sells the assets of the C Corp to the buyer, who gets a purchase price basis in the assets. The Midco keeps the difference between the asset sale price and the stock purchase price as its fee. The Midco's willingness to allow both buyer and seller to avoid the tax consequences inherent in holding appreciated assets in a C Corp is based on a claimed tax-exempt status or supposed tax attributes, such as losses, that allow it to absorb the built-in gain tax liability. If these tax attributes of the Midco prove to be artificial, then the tax liability created by the built-in gain on the sold assets still needs to be paid. In many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from the other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid.

*Diebold*, 736 F.3d at 175–76 (footnote and internal citations omitted).

The IRS may reach back to the selling parties, however, only if the multiple transactions are collapsed into one. As further explained in *Diebold*, this requires proof of two elements: 1) lack of a fair exchange and 2) actual or constructive knowledge of the scheme on the part of the sellers, i.e., no good faith. *Id.* at 184. The court drew much of its support from *HBE Leasing Corporation v. Frank*, 48 F.3d 623 (2d Cir. 1995), wherein the Second Circuit stated: "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [statute]." 48 F.3d at 635 (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35–36 (2d Cir.1993)). *HBE Leasing* describes a "paradigmatic scheme" under this collapsing doctrine as one in which one transferee gives value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. *Id.* The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing. *Id.*

Such a transaction can be collapsed if two elements are met. "First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the [party owing the liability] for less than fair consideration or with an actual intent to defraud creditors." *Id.* "Second, . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.*

As in our circumstances, the purchaser in *Diebold*, Sentinel, intended to use a newly formed intermediate entity, Shap Acquisition Corporation II ("Shap II"), to carry out the transaction. Sentinel, using Shap II, would buy all of the shares of the target corporation, Double D Ranch, from the shareholders of Double D for a price that worked out to be 97% of the market value of the Corporation's assets. "Had the Shareholders sold the assets directly, the tax liability would have caused the Shareholders to realize an amount that worked out to approximately 74.5% of the assets' market value . . . ." *Diebold*, 736 F.3d at 178.

If the transactions in *Diebold* were collapsed, the two sales would be seen for what they really were. It would be as if Double D, the target corporation, sold all of its assets to a third party and made a liquidating distribution to the plaintiff shareholders, receiving insufficient consideration with which to pay taxes.

Also, as in the present case, Rabobank makes an appearance:

> Sentinel intended to purchase the Double D stock through Shap II with financing from Rabobank. Even prior to taking ownership of the Double D stock, Sentinel planned on having Shap II immediately sell Double D's securities portfolio, as it intended to use the proceeds of that sale to repay the loan from Rabobank.

*Id.*

In general terms, the transaction there unfolded in much the same way as the sales here did. Shap II purchased the stock of Double D using loans from Rabobank. Immediately thereafter, Shap II sold the assets of Double D and used the proceeds to repay the loan, keeping a $10 million profit. When it filed a tax return, Shap II claimed losses to offset all the gain.

The court in *Diebold* collapsed the two transactions and found the sellers liable for unpaid taxes. Constructive knowledge of the sellers did "not require a showing that the party had actual knowledge of [the] scheme; rather, it is sufficient if, based upon the surrounding circumstances, [the owners of Double D] 'should have known' about the entire scheme." *Id.* at 187. The Second Circuit had no difficulty finding the first prong of *HBE* was satisfied applying the law of New York: one transferee (a third party) ended up with Double D's assets and another transferee (the Shareholders) received 97% of the fair market value for these assets, and Double D (the putative taxpayer) was left without funds to pay the IRS as creditor. In other words, there was not fair consideration because the sellers received virtually full market value for assets which, when sold, triggered a massive, embedded, tax liability. In effect, the tax liability made the intermediate buyer, which had borrowed the funds advanced to the shareholders, insolvent.

The remaining question was whether the Shareholders had actual or constructive knowledge of the entire scheme such that the exchange with Double D was fraudulent:

> Constructive knowledge in this context also includes "inquiry knowledge"—that is, where transferees "were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but . . . failed to make such inquiry." *Id.* As we noted in *HBE Leasing*, "[t]here is some ambiguity as to the precise test for constructive knowledge," *id.* at 636, in that some cases require "the

knowledge that ordinary diligence would have elicited," *see United States v. Orozco-Prada*, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986), *aff'd*, 847 F.2d 836 (table) (2d Cir.1988), and other cases have required a "more active avoidance of the truth." *HBE Leasing*, 48 F.3d at 636. However, even as we acknowledge this ambiguity in New York law, we need not reach the issue of which test to apply, because the facts here demonstrate both a failure of ordinary diligence and active avoidance of the truth.

*Diebold,* 736 F.3d at 187 (internal citations omitted).

Our reading of *Diebold* is that the requirement of constructive knowledge can be satisfied if the government shows that the sellers actively avoided informing themselves of the truth. Plaintiffs appear to agree that such proof would satisfy the government's burden. Their understanding of this inquiry, however, we find problematic. Plaintiffs characterize this test as follows: "In order to show 'active avoidance,' the government must show that once Plaintiffs learned something that indicated Haber's fraud, the Plaintiff took affirmative steps to shield themselves or consciously turn away from knowledge of Haber's fraud." Pls.' Post-Trial Resp. Br. at 4, ECF No. 174. That gilding makes no sense. If someone learns of another person's fraud, they are already tainted by "actual knowledge" and it would be unnecessary to go further to show avoidance. One cannot "turn away" from knowledge already possessed. Pretending ignorance of known fraud is different than deliberately avoiding becoming informed. Either would be sufficient for the government's purposes, but the inquiries are different. In our view, active avoidance means an individual suspects that the truth would be unfavorable so they take active steps to keep from finding it out.

In applying the test it described, the court in *Diebold* reached the conclusion that there was liability in the sellers based on the presence of seven factors. First, and of "great import" to the court was that the Shareholders recognized the "problem" of the tax liability arising from the built-in gains on the assets held by Double D and sought out parties that could help them avoid the tax liability inherent in a corporation holding appreciated assets.[18] 736 F.3d at 188. Second, the "parties to this transaction were

---

[18] The circuit court recognized that the knowledge, constructive or otherwise, of the problem was not limited to the eventual agreement between Double D and Shap II. It was the tax payers' knowledge of the potential tax liability inherent in the underlying assets, the so called "built-in gains," that were relevant, as here, in finding the taxpayer liable as a transferee. 736 F.3d at

extremely sophisticated actors, deploying a stable of tax attorneys." *Id.* Third, the shareholder representatives had a "sophisticated understanding" of the structure of the entire transaction. *Id.* Fourth, they knew that the buyer was a "brand new entity that was created for the sole purpose of purchasing Double D stock." *Id.* Fifth, they knew that the new entity was going to promptly sell the assets. Sixth, language was stricken from the stock purchase agreement concerning one of the purchasers. *Id.* at 189. Seventh, the sellers actively pushed for the closing date to be moved one day to accommodate sale of the assets. *Id.*

All of this was "more than sufficient to demonstrate that Shap II was a shell that did not have legitimate offsetting losses or deductions to cancel out the huge built-in gain it would incur upon sale of the Double D securities." *Id.* "Taken together, these circumstances should have caused the Shareholder representatives to inquire further into the supposed tax attributes that allegedly would have allowed Shap II to absorb the tax liability of which the Shareholders had intimate knowledge." *Id.* And, "Based on the myriad circumstances . . . of which they were aware, the Shareholders had a duty to inquire further into the circumstances of the transaction." *Id.*

As the court noted, when sellers undertake an exercise which begins with how to deal with a large, built-in tax liability, "it would be the very rare case indeed where a purchasing party would assume such liability without an appropriate discount in the sale price." *Id.* at 190. Being aware of those factors heightens the sellers' obligation to do diligent inquiry. *Diebold* concluded that there was constructive knowledge on the part of the sellers there because they deliberately chose not to inquire into the buyer's plan, despite the existence of a number of red flags.

*Diebold* thus gives us the basic legal framework to apply. Was there a conveyance for less than fair consideration in which HSHC or Humboldt and Shelby were left insolvent, leaving the IRS an unpaid creditor of the Dillon transferees? Whether there was a conveyance depends on collapsing the Stock Sale and subsequent asset sales into a single transaction, which, in turn, depends on whether the Dillons knew or should have known of DGI's plans, or willfully chose to remain ignorant of the facts in that respect. If the transactions can be collapsed, then, in effect, the Dillons received the proceeds of the sale of the Humboldt and Shelby assets as if they had liquidated the companies and distributed the proceeds to themselves directly, without bothering to pay the resulting capital gains tax. By virtue of collapsing the two transactions into one, it becomes apparent, under the facts

---

188.

here, that the exchange was not for fair consideration because the plaintiffs received more value than they gave, in view of the virtually simultaneous triggering of tax liability on the embedded assets.

Plaintiffs agree that, under *Diebold*, the court may collapse the Stock Sale with the rest of Haber's fraudulent scheme if the government "can show Plaintiffs had actual or constructive knowledge of Haber's *entire* fraudulent scheme." Pls.' Post-Trial Resp. Br. at 1 (emphasis added). We do not think, however, that the law requires a completely comprehensive understanding of what Haber had in mind. As in *Diebold*, we conclude that it is sufficient if either of two scenarios are proved by defendant: 1) the plaintiffs were on inquiry notice of the general outline of Haber's scheme—buy the corporate stock, sell the assets of the companies and then not pay the taxes—and yet they proceeded with the sale, or, 2) there were indicators of the potential for fraud and yet they deliberately chose to remain ignorant of what further inquiry might reveal.

There is one additional point as to which we are not entirely in agreement with plaintiffs. Under the scenario in which there is liability for willful ignorance, plaintiffs contend that the government must prove that further inquiry would have revealed Haber's fraudulent scheme. We disagree. We believe it is sufficient to show that there were indicators of potential fraud and a refusal to ask further questions, irrespective of whether Haber would have admitted his plans in detail.

## II.    Expert Testimony

With the legal framework established, we now turn to the testimony of the three experts. Defendant offered R. Jeffrey Malinak, an expert witness in corporate finance, corporate valuation, and corporate solvency. The primary purpose of his presentation was to demonstrate that HSHC was insolvent immediately after the Stock Sale. Defendant also offered the testimony of Professor Jennifer Blouin, of the University of Pennsylvania Wharton School of Business, who was qualified as an expert witness in accounting, public economics, and the taxation aspects of business decision making. She testified that there were no non-tax motivations or foreseeable economic benefits from the Stock Sale and that the existence of certain "red flags" should have alerted plaintiffs that HSHC's purchase was motivated by possible tax fraud.

Plaintiffs offered no one to rebut Mr. Malinak directly, but presented the testimony of Professor Guhan Subramanian, who holds joint appointments to Harvard's Business and Law Schools. He testified

concerning the adequacy of plaintiffs' due diligence, about the appropriateness of the auction used, and responded to Professor Blouin's catalog of "red flags."

We will begin with Professor Subramanian's presentation. He teaches courses in Corporate Law, Executive Education, Negotiations, Mergers & Acquisitions, and Corporate Deals. Professor Subramanian's research focuses on corporate deals, mergers & acquisitions, corporate law, negotiations, and on auction theory, which is a subfield of economics that evaluates the competitive bidding process whereby potential buyers push up the prices offered in an auction. He has co-written two corporate law case books, which contain material on mergers and acquisitions and due diligence, as well as several academic articles on particular areas of mergers and acquisitions, such as the deal process and the use of auctions. Professor Subramanian also has published books for practitioners on negotiations, auctions, deals, and structuring business transactions. As a frequent expert witness, he has testified concerning negotiations and corporate deals with a focus on mergers and acquisitions. He does not purport to have any expertise in tax matters.

Professor Subramanian was asked to offer opinions about the custom and practice that sellers would engage in regarding due diligence in a cash sale, and he then compared that practice with what the sellers did here. He testified that an auction was the logical method for plaintiffs to select a purchaser. He also testified that it is both customary and appropriate in cash sales, like those here, for the seller to perform limited, if any, due diligence, particularly given the representations and warranties ("reps and warranties") plaintiffs received from Haber. Representations are promises about existing conditions and warranties are promises about future conditions. They typically are a part of all merger and acquisition transactions.

Professor Subramanian also testified that representations and warranties secured through good faith negotiations between reputable law firms are an appropriate and reasonable substitute for additional due diligence. Based on his experience, if a party secures a representation, it will not—and need not—engage in additional diligence to verify that representation. In connection with warranties, which relate to a party's future conduct, in his view, the written warranty is the only assurance a party can secure. As Professor Subramanian explained, "[y]ou can't possibly get in the buyer's head and know whether they believe they're going to fulfill that commitment or not." Tr. 1571. Warranties, therefore, are better than due diligence because due diligence can only discover past conduct and cannot govern future conduct. Warranties are difficult to secure because buyers

typically do not want constraints on their future actions when they acquire a business.  Most warranties therefore have time limits.

Plaintiff also used Professor Subramanian to respond to the numerous "red flags" which defense expert Professor Blouin argues were present to warn plaintiffs of the possibility they were dealing with a fraudster.  For example, Subramanian said that it is entirely routine for merger and acquisition transactions to include a special-purpose vehicle; in his research, about 90–95% of the deals he analyzed involved some kind of special purpose vehicle ("SPV").  He also found nothing problematic with the last-minute substitution for Bank of New York with State Street Bank as the SPA escrow agent.  He agreed with Mr. Rooney that, in auctions for cash stock sales, the sellers did not typically request the buyer's financing documents.  Finally, Professor Subramanian concluded that the very fact that DGI and its law firm pushed back hard against plaintiffs in negotiating the SPA suggests, as a matter of transactional practice, that the buyer was negotiating in good faith.

Professor Subramanian's conclusions are not based on any assumptions that the plaintiffs actually did any due diligence on Haber and DGI; he testified he was not aware of what they did.  His argument is that no due diligence was required other than what was implicit in the cash sale/auction, i.e., none.

He further explained:

I do remember that K&Z was a well known entity to the sellers, and so you've got a representative of the buyer who you've encountered in the past.  That would be highly relevant.  I suppose you could call around and find out more, but – it wouldn't be normal, but you could do that in theory if you felt that there was some red flag that would warrant you to do that kind of investigation."

Tr. 1633.  We view his comment that K&Z as a well known entity to the sellers to be over-generous.  In any event, Subramanian did not testify about the market conditions in 2002 and whether there would have been an influx of buyers with NOLs at the time nor did he explain why it was reasonable for plaintiffs and their agents to have believed that there would have been such buyers.

Although Professor Subramanian also testified that it was reasonable for Bambino and others to conclude that higher bids were the result of

bidders' tax attributes, we find that part of his testimony is beyond his expertise. More importantly, we find it unpersuasive. The only factual fig leaf that plaintiffs can point to was their testimony that NOLs would have been abundant in buyers of assets at the time of sale, a belief that was not otherwise supported by Professor Subramanian, or anywhere else in the record, and which was soundly undercut by defendant's experts' more direct testimony on the point.

Professor Subramanian acknowledged that if a buyer refuses to agree to a certain representation that is important to the seller, "the seller will typically probe further in its due diligence."   Tr. 1588.   Professor Subramanian also acknowledged that, in certain cases, a seller will research the buyer, particularly in circumstances in which the buyer has a continuing relationship with the seller and where the buyer had a negative reputation. He agreed that both circumstances are present here, based on 1) HSHC's ongoing covenants to remain in business and retain substantial assets for one year and 2) the existence of negative press about DGI contemporaneous to the Stock Sale (without regard as to whether Shearman discovered it or not).

Defendant's first witness, Mr. Malinak is a managing principal at an economics consulting firm. He has extensive experience in corporate finance and financial economics, with a particular focus on damages estimation, applied finance theory, and business and asset valuation.   Mr. Malinak prepared testimony in three areas. His first conclusion was that the auction bids "would not have been economically rational unless the buyers believed that they could avoid most or all of the embedded tax liability." Tr. 1709. His second conclusion was that Humboldt and Shelby corporations, just prior to the stock sale, were solvent but that, immediately after the stock sale, the buyer, HSHC, was insolvent, and its insolvency was maintained through the following relevant period of time. The third aspect of his testimony was to respond to the report of Professor Subramanian.[19]

The premise behind the first part of his presentation is that the appropriate place to begin an analysis of the Stock Sale is to determine the fair market value of the Humboldt and Shelby stock. Applying a willing buyer/willing seller test, any willing buyer looking at this portfolio, which was common stock and the high quality/easy to value notes, would have taken into account the embedded tax liability. Whoever bought the corporate stock would assume that liability and have to account for it in its pricing

---

[19] He also prepared an analysis in response to someone who was listed in advance of trial as another expert witness for plaintiff, Ms. Yvette Austin-Smith. She was not, however, called to testify.

evaluation.  He concludes, therefore, that no willing buyer would have paid more than the after-tax value of those assets.  Only a highly idiosyncratic buyer would have been able to absorb that liability in such a way as to be able to pay market value for the assets.  In the absence of any evidence that a meaningful number of potential buyers would fall into that category, the fair market value of the portfolio should be reduced by $25.6 million, the tax liability embedded within the assets.

Because the bids received were well in excess of fair market value measured in this way, Malinak concluded that they were not economically rational unless the bidders believed that they could avoid, for a relatively low cost, all of the assumed tax liability.  In response to plaintiffs' suggestion that companies with accumulated NOL's might be in a position to offer more than fair market value, he opined that:

> [U]nless they were at risk of losing those – the access to those losses very soon, . . . they wouldn't give any to the seller here, because they could just go buy the stock or a fixed-income investment, like the notes, and then if those went up in value, they could use those losses to offset all of the gain . . . of the portfolio, that new portfolio they bought.

Tr. 1729.  In other words, there would be no incentive for a rational buyer to use accumulated NOLs as part of the purchase price to offset embedded gain.  That buyer could go into the marketplace and purchase identical assets at the same market value *without* giving up an asset of their own (its accumulated NOLs).  As he explained, on average, over time, stocks go up in value; so the purchaser could be assured of the opportunity to use the NOLs more effectively later.  Theoretically then, bidders would expect to compete only with bona fide purchasers who would approach the purchase from the same perspective, i.e., they could all be expected to discount the stock to account for the inherited tax liability.  As he and Professor Blouin both emphasized, it would be a highly idiosyncratic purchaser who could ignore the tax liability, and then it would have required the presence of at least two such highly idiosyncratic buyers to create a fair market value which did not include the tax discount because one such bidder would not bid against itself.

He went on to puncture Professor Subramanian's gauzy picture of a vast number of potential bidders seeking to bid up the price.  As a non-operating holding company, HSHC could not be expected to have any operating losses.  Further, as a newly formed entity, HSHC could not be expected to have any capital losses.  Nor was there a parent entity of HSHC that could be expected to have NOLs.  Mr. Malinak also testified that there

were no changes in the tax law in 2002 that would have created a market of companies with expiring NOLs, which would have to be used quickly before they became worthless.

Nor could additional value be ascribed to a desire to obtain operating control of the companies. Neither the targets, Humboldt and Shelby, nor HSHC, were operating companies such that synergies would have been expected due to the presence of goodwill. Thus no premium can be explained in that way. Neither Humboldt nor Shelby would have had value in that sense because they had no real operations.

He thus opined that the bidders were paying a substantial premium in excess of fair market value that had no rational basis given the unlikelihood of any legitimate way to absorb the tax liability or to generate additional value. Those justifications were "not present here." Tr. 1743. Malinak concluded that the alternative and only logical explanation for the two excessively high and similar bids is that both bidders anticipated a tax avoidance strategy that would allow them to escape paying most or all of the embedded tax liability on the underlying assets.

Malinak's second conclusion is that Humboldt and Shelby corporations were solvent immediately prior to the Stock Sale; something that is uncontested. His valuation of the companies is different from plaintiffs' approach, however. The companies were solvent, but on a fair market basis, the value of their highly saleable assets had to be adjusted to account for the embedded tax liability:

> [A]ny willing buyer looking at this portfolio, which is common stocks and just notes, which are very . . . easy to value, could have gone out in the open market and bought the same portfolio . . . without the embedded tax liability, and, therefore, no willing buyer would have paid more than the after-tax value of those assets.

Tr. 1711. Taking the approximately $26 million in tax liability out of the approximately $91 million in asset value would leave a fair market value of $65 million.

The second part of his solvency inquiry was a conclusion that, immediately after the Stock Sale on December 23, 2002, HSHC was insolvent. That same day it sold the securities it acquired to UBS PaineWebber for approximately $51 million, giving it $93 million in cash (including borrowings plus $6 million in cash from the corporations).

Together with the installment notes, that gave HSHC over $127 million in assets.  It had borrowed nearly $124 million, however, and, because of the $15 million in federal tax on the *realized* gains associated with the stocks and the $10 million in federal tax on the *unrealized* gains associated with the notes, on the day of the sale, it was actually insolvent by nearly $23 million. Four days later, after paying $90 million of its borrowings back with cash, it was still effectively insolvent.

> Insolvency, moreover, was readily predictable, as Malinak explained:

> They funded this acquisition of that stock portfolio with 100 percent debt.  You could predict . . . that's an untenable situation and that the lender is going to require you to sell the portfolio,    and    that's,    in    fact,    what    we see. . . . Rabobank . . . required the immediate sale of the stock portfolio, because they don't want to take that risk. You know, they're only earning 4 percent. They don't want to take a risk that that stock value is going to fall off the table.  So you didn't need that Rabobank agreement to know that this was an untenable situation.

Tr. 1761.[20]  In other words, the mere fact that this was a new entity, operating entirely with borrowed funds, should have been sufficient to put the stock sellers on notice that the Stock Sale would have to be followed virtually immediately by an asset sale, triggering all or part of the tax liability.

> It is also for that reason, as Malinak explained, that from an economic standpoint, the Stock Sale and the asset sales should be viewed as one transaction:

> From an economic perspective, those two transactions were joined at the hip. As I – we discussed earlier, the – especially the sale of the stock portfolio had to be – had to happen immediately as part of – just from an economic perspective, based on the fact that debt can't fund 100 percent of an equity investment in – you know, basic finance principles – but also the Rabobank agreement required the immediate sale of the portfolio.

---

[20] Using a somewhat different test of solvency, the capital adequacy solvency test, he concluded that as of the date of closing, HSHC had a 100 percent chance of default by July 2023.

So as soon as the transaction was completed, you had HSHC – you know, it was really set up to be unwound, okay, beginning with the sale of the stock portfolio, and then there is evidence or documentary support for the – for the intention of the parties to sell the notes off in short order. So the transactions were joined at the hip economically.

Tr. 1781–82.

The governments' second expert, Professor Blouin, presented a full scale assault on the bona fides of the stock sale and Professor Subramanian's attempted benign explanation for it. Like Mr. Malinak, her first task was to determine if there was any reason not related to taxes why a premium would have been paid on the shares of the stock. She concluded that there was none. In other words, the premium paid by HSHC made no economic sense:

[In] order to create these types of nontax, . . . economic benefits, . . . you're looking for synergies that typically come up in situations where there's a trade or business, and so in this particular setting there wasn't a trade or business that was being sold.

So . . . the buyer was a brand new entity that just came into being, so it didn't have any current trade or business with which to create synergies.

Tr. 2214. There was no obvious economic explanation for the premium.

She agrees with Malinak that the auction process yielded a bid that was uneconomic for a bona fide buyer; that there existed simpler alternatives with lower transaction costs to the sellers for disposing of Humboldt and Shelby; and that the stock sale resulted in a circular flow of funds, with the result that the transaction was effectively a liquidation of Humboldt and Shelby.

She thus supported Mr. Malinak's testimony that, even if there had been companies that suffered significant losses in 2002, those NOLs would have been eligible to be carried forward for twenty years. Thus there was no reason for buyers to give up NOLs in order to buy fungible assets. As she explained: "It would be a very, very, very unusual circumstance in that you have a pot of losses that are getting ready to expire, right? So the reason is there's no expectation that this buyer could use them in the future." Tr. 2243.

Professor Blouin explained why Professor Subramanian's suggestion that there could be tax synergies or tax attributes associated with two companies joining, while true in the abstract, was an unsupported speculation and not a possibility here. At most, plaintiffs could hope for HSHC to merge with an operating company that had NOLs in the future. *See* Tr. 2348 (Subramanian). But there are no facts to support a reasonable inference that HSHC was going to do so or that plaintiffs thought it might.

Moreover, Professor Bouin agreed with Mr. Malinak that it would take not just one, but more than one such 'unique,' bidder in order for the seller to achieve a sales price approaching fair market value without considering the embedded tax liability. If there were only one such bidder, it would have no incentive to use its NOLs unnecessarily. It would require competition between two such entities to create upward pressure on the price.

The use of an auction was also a mystery to Professor Blouin. It is Professor Blouin's understanding that auctions make sense for hard-to-value assets, where there could be disagreement about value. Here, however, it would be simple to calculate the precise value of the assets inside Humboldt and Shelby because they consisted of cash, high quality notes and stocks. Although, unlike Professor Subramanian, Professor Blouin did not profess to be expert on the use of auctions, her analysis makes sense to the court. The utility of the auction in this case was not to get a better understanding of the true market value of the assets (less the known tax liability), but to hope to find a buyer able, or at least willing, to ignore the true fair market value of the companies.

A straightforward sale on the open market of the assets would come, according to Professor Blouin, with far less friction costs and fees than the elaborate activities surrounding the auction, the escrows, and the SPA and the stock closing. This suggests another reason that the transaction was economically dubious. Of course, the additional cost attendant upon such a transparent direct sale would be the triggering of immediate tax liability, something the plaintiffs hoped to avoid.

From Malinak and Blouin we therefore conclude that there was no legitimate economically rational explanation for the DGI and TranStar bids. We reject Subramanian's efforts to persuade us to the contrary.

Professor Blouin also took issue with the narrative from plaintiffs and Professor Subramanian that "cash is cash" and therefore plaintiffs need not have been too fussy about their buyer. We agree with her analysis. Plaintiffs knew that a sword of Damocles always hung over their heads and that the

IRS had the ability and the incentive to unravel a sale if the buyers engaged in tax fraud. Plaintiffs thus had every reason to be concerned about events after the Stock Sale, and indeed had been warned by Bambino about that possibility. Moreover, the SPA was written in such a way that DGI made representations and warranties as to its future behavior which created an ongoing connection to plaintiffs.

Professor Blouin presents a series of circumstances surrounding the transaction which she is persuaded were "red flags" that should have tipped off the Dillons that the DGI offer was too good to be true. We will ignore two factors on which Blouin relied. One was the substitution of State Street Bank for the Bank of New York as escrow agent for environmental remediation funds, which she alleges was due to the bank's concern about HSHC's lack of capital. Another was Blouin's reference to an article about DGI in Forbes magazine which called DGI a "tax shelter promoter." We will ignore these latter two indicia because the government offered no evidentiary support for them. Their inclusion in Blouin's report is not a substitute for facts.

The first and most important red flag we have discussed: the total absence of any economic validity to the bids. It made no economic sense for two bidders to show up offering prices at virtually full value of the underlying assets. There was no mystery here in this regard other than that created by plaintiffs' own desire to remain ignorant, or to feign ignorance. The taxpayers are sophisticated entities advised on tax matters by an in-house firm, Keswick, and a prestigious international law firm. In fact, the record shows that Bambino warned of the consequences of selling to certain tax aggressive entities several times. In addition, there were other circumstances which Professor Blouin thought were caution signals. One was the general pushback by DGI on making any promises to hold assets for a lengthy period. DGI would not agree to hold a "substantial proportion" of assets for one year, substituting instead "substantial assets," which Blouin views as a less meaningful commitment. We agree. 'Substantial assets' is flabbier language than 'substantial proportion.' And DGI insisted on the right to immediately sell one of the notes and the others within seven months. She also finds the use of an auction unnecessary and therefore indicative of unusual circumstances.

Professor Subramanian attempted to minimize the relevance of Blouin's red flags. As to the first factor—the lack of economic credibility in the bids—we have already expressed our view that Subramanian's effort to rationalize the bids was totally unconvincing. In response to DGI's insistence on toning down the language on asset retention, he contends that

a true fraudster would not have pushed back at all; that Proskauer's repeated modifications to the SPA are indicative of a bona fide purchaser. We understand his explanation and are content to view DGI's insistence only as an indicator that DGI was reluctant to promise anything regarding retention of assets, which nevertheless should have alerted plaintiffs that the assets would be sold quickly, promptly triggering tax consequences.

Subramanian also finds that use of an auction was routine and not a cause for concern. We are persuaded, however, that his response does not meet the substance of Blouin's point—that an auction was unnecessary because of the liquidity of the assets and that it therefore added unnecessary complexity and cost. We view it much more likely that an auction merely offered a useful ambiguity about the sellers' motivations.

While we will not rely on Professor Blouin's reference to the Forbes article and the switch of escrow banks, we note that there were at least two publicly reported opinions which a search for Diversified Group, Inc. (DGI), or for James Haber would have turned up. One was *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001). The issues in that case had nothing to do with an IRS challenge to a midco transaction, but the factual background is relevant. As the District Court recited:

> DGI [wa]s engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes. DGI [wa]s not a licensed accounting firm nor d[id] it engage in the practice of law. DGI's business include[d] 'developing tax strategies and using them in transactions meeting clients' particular business and investment objectives.'

*Id.* at 448 (citations omitted). Bambino was unaware of this case.

A second publicly available opinion was *United States v. Diversified Group, Inc.*, No. M-18-304, 2002 WL 31947904 (S.D.N.Y. Nov. 25, 2002). That case involved an effort by the IRS to enforce a subpoena against DGI. The court notes in its decision that "[t]he IRS is currently investigating whether DGI has violated the tax laws regarding the registration and maintenance of records concerning tax shelters." *Id.* at *1.

Professor Blouin believes that the information she cites was contemporaneous and available to plaintiffs and their agents and would have signaled the lack of bona fides of the transaction. We find her experience and training to be particularly relevant because the focus of her work is on

how taxes affect business decision-making and how tax considerations can be distinct from other economic considerations. That is in distinction from Professor Subramanian, who declined to apply any tax considerations to his opinions.[21]

There can be no doubt that the accumulated tax liability was both known to a high degree of precision by plaintiffs (nearly $26 million), and was a driving consideration for the "tax guys." This is the same factor the court in *Diebold* found to be of "great import." There is no question that, at a minimum, Bambino, Ruddy and Allen were actually aware that, if the stock sale attracted a company which sold the appreciated assets, the stock sale and subsequent asset sales would trigger scrutiny by the IRS and that the agency might treat the transactions as a de facto asset sale by plaintiffs. We need go no further than Bambino's memos to his clients warning them of that possibility and trying to steer them in a direction away from the even more problematic schemes generated by Ruddy and his contacts.

Bambino and his clients knew plenty about the potential buyers, enough, in our opinion, to generate "red flags" that ought to have resulted in further inquiry. They knew that their clients were marketing assets with a built-in tax liability of $26 million. As tax professionals they knew that only a highly unique purchaser would not price its bid accordingly. They had been warned that there were unscrupulous bidders searching for fattened milch cows like Humboldt and Shelby to plunder through fraudulent tax schemes. They knew or had reason to know that HSHC was a newly formed entity under the control of James Haber, with *de minimis* assets, which borrowed substantially all of the purchase price using the assets of Humboldt and Shelby as collateral, and that the loans which would trigger a need to sell assets and thereby trigger tax liability in Humboldt and Shelby. Even the most rudimentary inquiry would have revealed the unlikelihood that HSHC itself had any useable NOLs because it was not and had never been an operating company. They knew that DGI would not disclose its plans for the assets of Humboldt and Shelby. Their acceptance of its explanation of "proprietary" concerns was either monumental naivete, gross negligence, or a useful fig leaf. We find the latter to be the truth. They knew that some of the notes would be pledged for cash immediately and that all the notes could be redeemed by the end of July 2003, well in advance of their maturity dates.[22]

---

[21] Unlike Professor Subramanian, however, she was not asked to opine on the level of due diligence done by the plaintiffs.

[22] *See Weintraut v. Comm'r*, 2016 WL 4040793, at *74 (U.S. Tax Ct. 2016)

They knew that the negotiations over the terms of the SPA left DGI with permission to sell virtually whatever it wanted of the assets transferred. Retaining a "substantial" amount is a toothless restriction. They knew that the Thornton note would be turned into cash immediately by being pledged to Rabobank and that the remaining notes could be pledged before the end of July, in advance of their maturity dates. Any such event would mean that HSHC, a "thinly capitalized" SPV would immediately become obligated to deal with the tax consequences of those sales.

In addition, what *should* Bambino have known? That Haber and DGI were being investigated by the IRS for potential violation of tax laws regarding the registration and maintenance of records concerning tax shelters.

In sum, Blouin and Malinak persuade us that there was nothing routine about the Stock Sale. It gave off more than enough warning signals that HSHC was not a good faith buyer and that its ability to pay virtually full value for the corporations' assets was based on a plan to sell the assets quickly to pay for the funds borrowed to buy the stock, thereby triggering an obligation to pay the embedded tax liability, something plaintiffs were eager to avoid having to do themselves. At a bare minimum, there were plenty of indicators of the possibility of fraud that plaintiffs were on inquiry notice to go further and attempt to assure themselves that Haber was not planning to sell the assets quickly and that he had the means to absorb the tax liability if he did. It is no answer to say, "Haber would not have revealed his plans to us." That is no doubt true but, under the circumstances, that would be further proof that plaintiffs could not deal with him in presumed innocence, or in good faith.

Plaintiffs clearly did not want to know the facts about HSHC because that would have jeopardized their ability to accept an unrealistic bid for the corporate stock. Bambino was remarkably uninterested in performing any serious due diligence on DGI, Haber or TranStar. He never spoke to Zack, Haber, Huber, or anyone at DGI. Nor do we have any basis for finding that his clients did any such investigation. It is fair to conclude that this approach was not because they knew it would have been pointless due to the bona fides of the bidders, but rather that plaintiffs and their counsel did not want to know what an investigation would reveal, because then they would be accountable

_____

(not accepting the explanation that stockholders did not make inquiries because the buyer's business strategy was proprietary and they assumed buyer would not share any details about its plans with them.)

for dealing with the results.  We find that plaintiffs and Bambino wanted to make a virtue of willful ignorance so that they could profess to be innocent sellers.

Plaintiffs rely on Professor Subramanian's testimony to create an inky cloud of innocent possibilities in an attempt to camouflage their willful ignorance.  His view that "I don't think it's possible to do due diligence to prevent fraud," Tr. at 1632, would read out of the law any obligation to investigate a purchaser.

Plaintiffs' willful ignorance is sufficient to demonstrate constructive knowledge of fraud.  Once having found constructive knowledge, we can collapse the Stock Sale with the subsequent Asset Sales.  We then have a conveyance (the transfer of money to plaintiffs), an absence of fair consideration, because the plaintiffs were receiving more than the property was worth when taxes are accounted for, and because there was no good faith on the part of the transferees, and we have an insolvent transferor (HSHC and its subsidiaries).  The government has thus met its burden of showing by clear and convincing evidence that: 1) the IRS was a creditor at the time of the conveyance; 2) the conveyance lacked fair consideration, because $86.8 million was not a fair equivalent for corporations with a net value of $65 million and because plaintiffs lacked good faith; and (3) the conveyance resulted in HSHC's insolvency, leaving the IRS unpaid.  We thus find the Dillon trusts liable as transferees under New York law and I.R.C. § 6901.

## AMOUNT OF RECOVERY

The IRS issued a statutory notice of deficiency to HSHC for the 2003 tax year in the amount of $25,617,887.  It also assessed a gross valuation misstatement penalty under I.R.C. § 6662(h) of $10,247,155, along with statutory interest.  Having recovered nothing from HSHC, it seeks to impose that entire amount against plaintiffs.   Plaintiffs argue that, even if the government establishes that they were transferees of Haber under state law, that they are not liable for 100% of the taxes, interest, and penalties which Haber left unpaid.  In this regard they point to the final provision of § 278 of the NYUFCA:

> *§ 278 Rights of creditors whose claims have matured.*
>
> 2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

49

It is true that liability under §§ 273 or 276 can potentially attach without regard to the intent of the transferees.  There may be fraud due to the fact of insolvency and the lack of good faith of the transferor.  In that circumstance, the good faith of the transferee can eliminate or limit liability under § 278(1) and (2).

Plaintiffs go further, however, and contend that there is a distinction between the "constructive" fraud which triggers § 273 and the words of § 278, which refers to "actual fraudulent intent."  In other words, even if the court has found that plaintiffs are transferees by collapsing the transactions due to constructive fraud on their part, they contend that, if they did not engage in "actual fraudulent intent," the most for which they can be liable is the difference between what they gave, $91 million in stock, less $26 million in tax liability, i.e., $65.8 million, and what they received, namely, $86.33 million.  Thus their liability would be capped at $21 million.  As a separate point, plaintiffs argue that if the court finds, pursuant to § 278(2), that the plaintiffs acted without "actual fraudulent intent," then the penalties applied against HSHC cannot be asserted against plaintiffs, irrespective of the cap.

Defendant argues that the cap has no application.  That, having collapsed the transactions here, the court necessarily has found constructive fraud on the part of the plaintiffs, and therefore we cannot also find that plaintiffs acted without actual fraudulent intent.

The statute is unclear on whether the constructive fraud assumed under § 273 and actual fraudulent intent under § 278(2) are different from each other.  Some of the cases cited by defendant suggest that a lack of "good faith" implies "actual fraudulent intent."  *See In re Allou Distribs., Inc*., 446 B.R. 32, 69 (Bankr. E.D.N.Y. 2011); *In re Foxmeyer Corp.*, 286 B.R. 546, 581 (Bankr. D. Del. 2002).  We note as well that the Second Circuit seems to have addressed the question directly, albeit without citation, in *Ruderman v. United States*, 355 F.2d 995, 998 (2d Cir. 1966): "[A]ctual fraud is not limited to fraudulent conveyances which fall within the definitions of § 276 . . . but may include transfers which are denoted as 'constructively fraudulent' and which fall, for example within § 273 . . . ."

If *Ruderman* controls, then the government is correct.  The court having found constructive fraud, plaintiffs cannot rely on § 278(2).  Even if it took less evidence to find constructive fraud than to show actual fraudulent intent, however, the relevant evidence is obviously similar.  What is clear, in any event, is that even if such a defense is available to plaintiffs here, they bear the burden of proof in establishing that they acted without actual fraudulent intent.  *See In re Jacobs*, 394 B.R. 646, 659 (Bankr. E.D.N.Y.

2008) (an innocent purchaser must affirmatively show good faith under § 278(2)).

As explained in *In re Jacobs*, "actual fraudulent intent is rarely susceptible to direct evidence and may be inferred from the circumstances surrounding the transaction." *Id.* The "badges of fraud" pointed to there include inadequate consideration, the financial condition (solvency) of the party sought to be charged (HSHC in this case), or a pattern or series of transactions after the debt is incurred suggestive of fraud. *Id.*; *see also DeWest Realty Corp. v. IRS*, 418 F. Supp. 1274, 1279 (S.D.N.Y. 1976); *Buckrey v. Comm'r*, 2017 WL 2964716, at *14–15 (U.S. Tax Ct. 2017). Admittedly these indicia are most telling here in proving that HSHC intended to commit fraud, but we cannot ignore them, and indeed have not ignored them, in determining plaintiffs' level of culpability. They had every reason to know they were receiving too much consideration, and they knew or should have known that HSHC would be insolvent after the Stock Sale. We have also found that plaintiffs did virtually no due diligence about HSHC, despite warning signs that Haber might be a tax shelter promoter, and that HSHC was created solely for the transaction and had no real way to absorb the built in tax liabilities. The principals of plaintiffs and their advisors were well acquainted with tax law, as well as the burden of the built-in gains, and were clearly looking for a way to minimize the impact of those gains. Their principal adviser, Bambino, declined to give a tax opinion about the bona fides of the transaction. In the face of this negative evidence, the "affirmative" evidence plaintiffs point to of their lack of fraudulent intent is minimal. The impressive family history of public service and the use of an auction for example do nothing to diminish the negative import of the other indicia. We cannot find that plaintiffs have carried their burden to prove a lack of actual fraudulent intent.

In short, the $26 million "cap" does not exist. Nor are the plaintiffs immune from liability for penalties and interest. The amount HSHC owed and whether that amount can be collected from a transferee under § 6901 is subject to federal law. *See Tricarichi v. Comm'r*, 908 F.3d 588, 593 (9th Cir. 2018) (I.R.C. determines the amount of creditor's underlying claim); *Buckrey*, 2017 WL 2964716 at *19–20; *Kreps v. Comm'r*, 42 T.C. 660, 670 (U.S. Tax Ct. 1964). It is clear that if the assets received by the transferee exceed the total tax liability of the transferor, as they do here, then all the pre-notice interest and penalties owed by HSHC can be asserted against plaintiffs. *Tricarichi*, 908 F.3d at 591; *Buckrey*, 2017 WL 2964716 at *19–20.

Finally, plaintiffs contend that under the doctrine of equitable

recoupment, they are entitled to a $4.2 million credit against any liability for having overpaid on their capital gains tax on the Stock Sale. The theory is that if the stock was actually worth $21 million less than HSHC paid for it, then plaintiffs should only have received $65 million, and by reporting income of $86 million they paid $4.2 million too much in tax. We decline to accept that argument because it is too late. It appears nowhere in the complaint or pretrial materials and so therefore was not tried. Collapsing the Stock Sale to determine whether there was fraud does no violence to the logistics of the tax filings. Unraveling the plaintiffs' tax returns would, however. That would involve amended tax returns and would have triggered other potential calculation questions. The government was not on notice of the potential adjustment and it is fundamentally unfair to ask the court to make the adjustments on the fly after trial.

## CONCLUSION

The court has determined that the Stock Sale and subsequent asset sales should be viewed contemporaneously and that therefore the government has demonstrated under New York law that plaintiffs were transferees of HSHC and therefore liable pursuant to § 6901 for HSHC's unpaid taxes, penalties, and interest. Other than arguments previously disposed of, plaintiffs have made no assertion that they overpaid the amounts HSHC left owing, and the government has not filed a counterclaim seeking to assert claims for any additional unpaid amounts. Accordingly, judgment is entered on behalf of the United States and plaintiffs' complaint will be dismissed. The clerk is directed to enter judgment accordingly in this docket and the consolidated dockets: Nos. 17-1898T, 17-2022T, 17-2023T. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge